[No. E034765. Fourth Dist., Div. Two. Feb. 18, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
DEBORAH DAVIS, Defendant and Appellant.

1420

## COUNSEL

Hooper, Lundy & Bookman, Mark E. Reagan, John Dratz, Jr., Mark A. Johnson; Tyler & Wilson and Elizabeth Plott Tyler for Defendant and Appellant.

Bill Lockyer, Attorney General, Mark Zahner, Assistant Attorney General, and Brian V. Frankel, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**RAMIREZ, P. J.—**

### INTRODUCTION

In this case, we address the mental state which is required for a criminal conviction for failure to report abuse or suspected abuse of a dependent adult in violation of the Elder Abuse and Dependent Adult Civil Protection Act. (Welf. & Inst. Code, § 15600 et seq., hereafter sometimes the Act or the Elder Abuse Act.)[1]

Deborah Davis (defendant), a licensed nursing home administrator, was convicted in a nonjury trial of one count of failing to report abuse or suspected abuse of a dependent adult, a misdemeanor. (§ 15630, subds. (b)(1), (h).) She asserts that the trial court erred by finding her guilty based on its conclusion that a reasonable person in defendant's position would have entertained a suspicion that abuse had occurred. Defendant contends that she

---

[1] All further statutory citations are to the Welfare and Institutions Code unless another code is specified.

cannot be held criminally liable for a violation of section 15630 unless she subjectively recognized that the incident in question constituted abuse. She argues that the language of section 15630, coupled with the "reasonable suspicion" standard articulated in section 15610.65, means that she was permitted to apply her expertise as a nursing home administrator and determine, based on standards prevailing in the industry, whether the incident constituted abuse. Further, she contends, criminal liability depends upon whether her failure to report it constituted a gross violation of the standard of care prevailing in the industry. She implicitly contends that under the correct legal standard, as she articulates it, there was no substantial evidence to support a conviction.

Defendant's contentions reflect a fundamental misunderstanding of the requirements of section 15630. As we discuss below, the Elder Abuse Act was enacted to protect a class of people who are particularly vulnerable to abuse at the hands of those entrusted to care for them. To afford the maximum protection to that vulnerable population, section 15630 requires a mandated reporter to report any known abuse, any report by an elder or dependent adult that he or she has suffered conduct which constitutes abuse, and any facts or circumstances which would cause a reasonable person in the reporter's position to suspect that abuse occurred. (§ 15630, subd. (b)(1).) To apply the Act in the way defendant suggests would defeat its goal of preventing abuse by providing for the broadest possible reporting of known or suspected abuse.

Substantial evidence supports the trial court's alternate finding that defendant actually knew the incident constituted abuse and deliberately chose not to report it, and we therefore need not address the contentions she makes on appeal in order to affirm her conviction. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].) We choose to do so, however, because the evidence at trial indicates that defendant's position may reflect a belief which is widely held in the nursing home industry at the administrator level. It is important to dispel these misconceptions in order to effectuate the purposes of the Act.

## PROCEDURAL HISTORY

A misdemeanor complaint alleged one count of failing to report, as a mandated reporter, an incident of abuse of a dependent adult, pursuant to section 15630, subdivisions (b)(1) and (h).

Following a bench trial, the court found defendant guilty. The court sentenced defendant to three years' probation and 500 hours of community service.

Defendant filed a timely notice of appeal to the appellate department of the superior court.

On request of both parties, the appellate department certified the case for transfer to this court without deciding the appeal. (Cal. Rules of Court, rule 63(a), (b), (d).) This court ordered the case transferred to it. (Cal. Rules of Court, rule 62.)

## FACTS

Defendant Deborah Davis was the licensed administrator of Vista Pacifica Center, a private skilled nursing facility providing both long-term and short-term psychiatric care. Vista Pacifica is a locked facility. As an administrator of a long-term care facility, defendant was a mandated reporter under the Elder Abuse Act. (§§ 15600 et seq., 15630, subd. (a).)[2] Licensed administrators are responsible for ensuring compliance with state and federal requirements concerning the reporting of abuse, and defendant had received training in recognizing abuse and understanding the reporting requirements. She also received continuing education concerning mandatory reporting requirements.

The victim, a 19-year-old male (the victim), was a resident at the facility. The parties stipulated that the victim was a dependent adult within the meaning of the Act.

On or about April 2, 2000, Irma Roberts, a registered nurse who was on duty as house supervisor, saw the victim and a female patient arguing over a chair. Roberts intervened, sending the female patient to one end of the hall and taking the victim with her to the other end. While Roberts discussed the incident with the victim, he still had the chair in his hand but was not brandishing it. Roberts and the victim were speaking calmly to one another and the victim was receptive to what Roberts was saying to him.

Certified Nursing Assistant Gregory McMillan approached and asked Roberts what was going on. Roberts told him that the victim and the other patient had been arguing but that everything was all right. She did not ask for his assistance, and nothing in the victim's behavior or demeanor indicated that the victim constituted a threat. Nevertheless, McMillan threw his keys and clipboard to the floor, snatched the chair from the victim's hand, and

---

[2] "Any person who has assumed full or intermittent responsibility for care or custody of an elder or dependent adult, whether or not that person receives compensation, including administrators, supervisors, and any licensed staff of a public or private facility that provides care or services for elder or dependent adults, . . . is a mandated reporter." (Stats. 1999, ch. 236, § 1.)

threw it down the hallway. In a loud, combative tone, McMillan ordered the victim to go to his room. The victim complied, walking backward toward his room. As he did so, McMillan kept repeating, "Go to your room." The victim kept walking but said that he didn't do anything, that it was his chair first. McMillan walked with the victim, getting closer and closer to him. McMillan bumped into the victim, who responded by pushing McMillan away and saying, "Get off me." The victim did not use significant force in pushing McMillan away and did not indicate by word or body language that he wanted to fight. McMillan hit the victim on the shoulder, spun him around so his back was toward McMillan, and grabbed the victim around the neck with his right arm. He then forced the victim to the floor.

The victim said, "You're choking me." Roberts, who was above McMillan in the chain of command, ordered McMillan to release the victim. McMillan did not comply. After McMillan had had his arm around the victim's neck for five to seven seconds, Roberts went to the nurse's station and called a "code amber." "Code amber" indicates an emergency and requires all available staff to respond. It is usually invoked when it becomes necessary to control an unruly patient. In Roberts's experience, a "code amber" had never before been called in order to control an employee.

Steven Jones, a licensed psychiatric technician, was returning from a break and happened to be in the hallway outside the victim's room when Roberts issued the "code amber." When Jones arrived, Roberts was at the nurses' station. The victim was seated on the floor in the hallway. McMillan was kneeling behind him, pinning the victim's arms behind him and pinning his hands to the floor. McMillan and the victim apparently went into the victim's room while Jones was at the nurses' station speaking to Roberts. Roberts asked Jones to go in and remove McMillan from the room. Jones ordered McMillan to get away from the victim, and he complied. The victim was near the bed and McMillan was near the door. McMillan was pointing at the victim and ordering him to sit on the bed. His manner was very threatening and aggressive. He was rigid, staring at the victim, pointing at him, and talking in a loud tone of voice.

Jones and Roberts both checked the victim for injuries and to see if he was in pain. Neither observed any injury. Roberts authorized medication to calm the victim. After she learned of the incident, defendant had the victim examined by a physician to determine whether he was injured and had a psychologist and a psychiatrist interview him to see if the incident had caused the victim any psychological harm. All three reported to defendant that the victim had suffered no injury or ill effect from the incident.

Jones and Roberts prepared an incident report. In it, Roberts described McMillan's conduct as set out above, and stated that she saw him choking the victim.

Roberts transmitted the report to Julia Lee, the facility's director of nursing. Lee gave the written incident report to defendant the day after the incident. Defendant instructed Edward Hodge, the "social service designee" at Vista Pacifica, to interview the victim and write a report. Hodge reported to defendant, both orally and in a written report, that the victim had told him that McMillan grabbed him by the arm and twisted him around, held him in a headlock and then put his arm around his throat. The victim told Hodge that he told McMillan to let go because he couldn't breathe, but McMillan held him more tightly around the throat.

All of the nursing staff who were asked testified that, in their opinion, choking a patient or the use of a chokehold constitutes physical abuse which must be reported. A chokehold can stop oxygen to the brain, possibly resulting in fainting, brain swelling, stroke, spinal cord damage, or death. It can also damage the trachea. However, although defendant fired McMillan for improper conduct toward the victim, she decided not to report the incident as abuse because the victim was not injured, either physically or psychologically.[3] She also based her belief that she did not have to report the incident on the fact that a similar prior incident, which she did report, was later determined by the Department of Health not to constitute abuse.[4]

Defendant's position was supported by her direct superior, Cheryl Jumonville. Jumonville was the executive vice president of Vista Pacifica Enterprises, the company that operates Vista Pacifica Center. Jumonville oversaw operations at Vista Pacifica Center and was also the licensed administrator of another facility, and, as such, a mandated reporter. Jumonville understood that only incidents of "substantiated" abuse had to be reported; mere "alleged" abuse did not have to be reported. She felt that the

---

[3] There was evidence that defendant chose not to report the incident because she was concerned about the number of incidents involving patients which had been reported to the state during recent months. There was also evidence that written reports had been altered by lining out the words "choking him" in the report Roberts prepared, and that defendant had directed staff to avoid words such as "abuse" or "assault" in their reports. Although, as we discuss below, this evidence is pertinent to the court's finding that defendant knew the incident constituted physical abuse and deliberately chose not to report it, it is not pertinent to the issue defendant raises on appeal, i.e., that she had no duty to report the incident because she determined that it did not constitute abuse.

[4] Defendant's supervisor, Cheryl Jumonville, testified that the department did not state that it found "no abuse." Rather, it stated it had found "no deficiency." She considered the two synonymous. Defendant's expert, Kathy Hurst, acknowledged that the department's decision not to issue a deficiency could mean that abuse occurred but that the department could not substantiate it.

victim's "allegation" of abuse was not substantiated because the victim was not injured. She did not consider any incident reportable if the resident did not suffer any physical or emotional injury.

Kathy Hurst, a registered nurse with a master's degree in nursing administration, testified as an expert in federal and California statutes and regulatory provisions concerning reporting of abuse of residents in long-term care facilities. In her opinion, the McMillan incident did not constitute abuse because McMillan had no "willful intent" to cause the victim any harm. Her review of the records she was provided convinced her that although McMillan overreacted, he had no willful intent to injure the victim because he was aware that the victim had a history of psychosis, auditory hallucinations and aggressive behavior. She believed that it was appropriate for McMillan to intervene physically in order to "deescalate" the victim. She did not consider it significant that Irma Roberts reported that she had the situation under control. She also concluded that there was no "reasonable suspicion" of abuse because the victim was not injured. She acknowledged that under California law, a mandated reporter is required to report an allegation of abuse made by an elder or dependent adult. However, none of the reports indicated that the victim reported being "abused."

Sitting as the trier of fact, the trial court found that as an experienced mandated reporter, defendant "knew or should have known" that abuse occurred. The court found that the victim was not acting aggressively and that he posed no threat, that McMillan's conduct was not a reasonable response to the situation, and that McMillan did not act in defense of himself or of others. His acts constituted battery and assault by means of force reasonably likely to result in great bodily injury. In denying defendant's motion for a new trial, the court stated that it also found that defendant had more than a mere suspicion that abuse had taken place. Rather, defendant had actual knowledge that abuse occurred and that she deliberately sought to circumvent the law and avoid an investigation by not reporting it.

## DISCUSSION

### The Elder Abuse Act Mandates Reporting of Any Circumstance Giving Rise to an Objective Basis for Suspecting That Abuse Occurred

*Introduction*

As pertinent here, section 15630 provides that "[a]ny mandated reporter, who, in his or her professional capacity, or within the scope of his or her employment, has observed or has knowledge of an incident that reasonably

appears to be physical abuse, . . . or is told by an elder or dependent adult that he or she has experienced behavior, . . . constituting physical abuse, . . . or reasonably suspects that abuse, shall report the known or suspected instance of abuse by telephone immediately or as soon as practically possible . . . ." (§ 15630, subd. (b)(1).)[5] Section 15610.65 provides that "reasonable suspicion" means "an objectively reasonable suspicion that a person would entertain, based upon facts that could cause a reasonable person in a like position, drawing when appropriate upon his or her training and experience, to suspect abuse."

Defendant argues that these two sections, read together, require that she personally suspected abuse and that she was permitted to apply her professional expertise to resolve any such suspicion—that is, if she determined that the allegation of abuse was unfounded, based on her experience and training, she did not entertain a reasonable suspicion and therefore had no duty to report the incident as suspected abuse. She describes it as a hybrid subjective/objective standard, or an objective standard superimposed on a primarily subjective standard. The Attorney General argues that the statutes provide for a purely objective standard, i.e., that a report is required if a reasonable person in a like position would have suspected abuse. We conclude that the statutes provide for an objective standard, and that they do not permit the application of a mandated reporter's expertise to allow the reporter to determine whether abuse occurred. Rather, if the circumstances give rise to an objective basis for *suspecting* that abuse occurred, reporting is mandatory. The duty to investigate and the authority to determine whether abuse actually did occur are vested in outside agencies.

### The Act Applies an Objective Standard

 The meaning and construction of a statute is a question of law, which we decide independently. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) We apply the following principles: "The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. [Citation.] Ordinarily, the words of the statute provide the most reliable indication of legislative intent. [Citation.] When the statutory language is ambiguous, [we] may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes." (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152 [69 Cal.Rptr.2d 329, 947 P.2d 291].) "In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the

---

[5] Amendments to section 15630 since April 2000, the date of the charged offense in this case, have made no changes which are material to the issues in this case. (See Historical and Statutory Notes, 77 West's Ann. Welf. & Inst. Code (2005 supp.), foll. § 15630, p. 17.)

Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citations]." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) We may consider the objects to be achieved, the legislative history, and the wider historical circumstances of the statute's enactment. (*Ibid.*; *Pacific Gas & Electric Co. v. County of Stanislaus, supra*, 16 Cal.4th at p. 1153.) The Legislature is presumed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute on the same or an analogous subject in light of the existing judicial decisions. (*People v. Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078].) The Legislature is also presumed to have used similar language in similar or analogous statutes identically. (*People v. Casillas* (2001) 92 Cal.App.4th 171, 183 [111 Cal.Rptr.2d 651].)

The language of section 15630, subdivision (b)(1)[6] is ambiguous with respect to the state of mind of the reporter. The phrase "is told by an elder or dependent adult that he or she has experienced behavior . . . constituting physical abuse, . . . or reasonably suspects that abuse" makes direct reference to what the mandated reporter suspects, and thus suggests a subjective standard. (*Ibid.*; see *Landeros v. Flood* (1976) 17 Cal.3d 399, 415 [131 Cal.Rptr. 69, 551 P.2d 389], discussed below.) However, section 15610.65 defines "reasonable suspicion" in objective terms, thus raising a question as to the intended meaning of "reasonably suspects" as used in section 15630. For the reasons which follow, we conclude that the Legislature intended to create solely an objective standard for determining when it is necessary to report suspected abuse.

First, the legislative history of section 15630, along with the history and interpretation of similar language in the analogous Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.),[7] reflects an intent to mandate

---

[6] All further references to section 15630 generally refer to subdivision (b)(1) of that statute, unless another provision is cited.

[7] In *People v. Heitzman* (1994) 9 Cal.4th 189 [37 Cal.Rptr.2d 236, 886 P.2d 1229], the California Supreme Court noted that Penal Code section 368, subdivision (a), which provides for criminal penalties for specified forms of abuse of elder or dependent adults, was modeled directly on Penal Code sections 273a and 273d, which penalize similar forms of child abuse. The court noted that in most states, elder and dependent adult abuse statutes were modeled on existing child abuse statutes. (*People v. Heitzman, supra*, 9 Cal.4th at pp. 202–203.) The court did not explicitly hold that the Elder Abuse Act was modeled directly on the Child Abuse and Neglect Reporting Act. However, the two statutory schemes serve analogous purposes and contain many analogous provisions. Thus, in the absence of any evidence to the contrary, we can conclude that the Legislature intended the similar language of the child abuse reporting statutes and the elder and dependent adult abuse

reports of suspected abuse if the facts known to the reporter would give rise to an objectively reasonable suspicion that abuse occurred, rather than the subjective or subjective/objective standard defendant advocates.

In *Landeros v. Flood, supra*, 17 Cal.3d 399, the court addressed former Penal Code section 11161.5, which was the precursor to Penal Code section 11166, the current child abuse reporting statute. (See *Alejo v. City of Alhambra* (1999) 75 Cal.App.4th 1180, 1188, fn. 6 [89 Cal.Rptr.2d 768].) Former Penal Code section 11161.5 required a physician to report suspected child abuse if he observed an injury to a child which "appears to the physician" to have been nonaccidentally inflicted. (Stats. 1976, ch. 242, p. 460.) The court held that this language was ambiguous "with respect to the required state of mind of the physician." (*Landeros v. Flood, supra*, 17 Cal.3d at p. 415.) Because the statutory language referred to the physician's personal perception, the court interpreted it to mean that both civil and criminal liability for violation of the statute must be based on a finding that the physician actually formed the opinion that the injuries were nonaccidental. (*Ibid.*)

When former Penal Code section 11161.5 was repealed (Stats. 1980, ch. 1071, § 1, p. 3420) and Penal Code section 11166 was enacted, the Legislature employed significantly different language. Section 11166, subdivision (a) originally required a health care provider or other mandated reporter "who has knowledge of or observes a child . . . whom he or she *reasonably suspects* has been the victim of child abuse" to report the known or suspected abuse to a child protective agency. (Stats. 1980, ch. 1071, § 4, p. 3422, italics added.) A 1981 amendment changed the language to "a child . . . whom he or she knows or reasonably suspects has been the victim of child abuse." (Stats. 1981, ch. 435, § 2, p. 1670.) The current version of section 11166 also uses the "knows or reasonably suspects" formulation. (Pen. Code, § 11166, subd. (a).) Subdivision (a), as enacted in 1980 and as currently in effect, defines "reasonable suspicion" to mean "that it is objectively reasonable for a person to entertain a suspicion, based upon facts that could cause a reasonable person in a like position, drawing, when appropriate, on his or her training and experience, to suspect child abuse. . . ." (Pen. Code, § 11166, subd. (a)(1); Stats. 1980, ch. 1071, § 4, p. 3422.)

The Child Abuse Reporting Act of 1980, of which Penal Code section 11166 is a part, was enacted to rectify the problem that many instances of child abuse were going unreported. (*Krikorian v. Barry* (1987) 196 Cal.App.3d 1211, 1216-1217, 242 Cal.Rptr. 312.) One purpose for the linguistic change from former Penal Code section 11161.5 was to remove the

reporting statutes to have the same meaning. (*People v. Casillas, supra*, 92 Cal.App.4th at p. 183.)

"impediments to reporting engendered by the 'personal observation' requirements of *Landeros v. Flood, supra,* 17 Cal.3d at page 415." (*Krikorian v. Barry, supra,* 196 Cal.App.3d at p. 1217, citing State Bar of Cal., Rep. on Assem. Bill No. 2497 (1979–1980 Reg. Sess.) pp. 1–2; Legis. Counsel's Dig., Sen. Bill No. 718, 3 Stats. 1980 (1979–1980 Reg. Sess.) Summary Dig., p. 333.) In *Landeros,* the court described its construction of the statute as "resolv[ing] the ambiguity in favor of the offender," i.e., as providing for narrower circumstances under which reporting was required. (*Landeros v. Flood, supra,* 17 Cal.3d at p. 415.) Inferentially, then, the impediments to reporting created by *Landeros v. Flood* also included the holding that under former Penal Code section 11161.5, the duty to report was triggered only if the physician actually formed the opinion that the child's injury was nonaccidental. Thus, the Legislature's change in language in the new statute reflects its intent to create an objective standard in order to broaden the circumstances under which reporting is required.

Any ambiguity in the Legislature's intent with respect to the meaning of the phrase "reasonably suspects" was laid to rest in 2000. In 1999, in *Alejo v. City of Alhambra, supra,* 75 Cal.App.4th 1180, the Court of Appeal interpreted Penal Code section 11166 to impose a mandatory duty to report suspected child abuse if the facts known to the reporter would cause a reasonable person in the reporter's position to suspect child abuse, i.e., an objective standard. (75 Cal.App.4th at p. 1186.) The 2000 legislation amending various sections of the Child Abuse and Neglect Reporting Act, including Penal Code section 11166, states that "[t]his act is not intended to abrogate the case of *Alejo v. City of Alhambra* (1999) 75 Cal.App.4th 1180 [89 Cal.Rptr.2d 768]." (Stats. 2000, ch. 916, § 34, italics added.) By expressly recognizing the decision in *Alejo v. City of Alhambra,* without making any amendments to the relevant language of Penal Code section 11166, subdivision (a), the Legislature clearly indicated that its intent was to impose an objective reporting requirement.

The history of Welfare and Institutions Code section 15630 similarly reflects an intent to create an objective reporting requirement. The phrase "reasonably suspects" did not appear in section 15630 until the 1998 amendment to that statute.[8] (Stats. 1998, ch. 980, § 1.) By that time, the Legislature had indicated its acceptance of the objective definition of the phrase "reasonably suspects" by failing to amend Penal Code section 11166 in response to

---

[8] We refer herein to different versions of section 15630 as "amendments" for the sake of simplicity. In fact, the statute has been repeatedly repealed and reenacted, as well as amended. (See Historical and Statutory Notes, 77 West's Ann. Welf. & Inst. Code (2001 ed.) foll. § 15630, p. 43.)

the decision in *Alejo v. City of Alhambra, supra,* 75 Cal.App.4th 1180. We conclude, therefore, that by adopting the same language in the analogous provisions in section 15630, the Legislature intended it to have the same meaning. (*People v. Casillas, supra,* 92 Cal.App.4th at p. 183.)

The phrase "reasonably appears to be" abuse, as used in section 15630, also reflects an intent to base the duty to report on objective criteria. The phrase was first used in section 15630 as it was amended in 1994. (Stats. 1994, ch. 594, § 7, p. 2939.) The available legislative history materials pertinent to that amendment do not provide any explanation for the Legislature's choice of that phrase, as opposed to "reasonably suspects," as used in Penal Code section 11166.[9] However, the phrase "reasonably appears to be" abuse does not refer to the individual reporter's perception but rather to what an objective observer would perceive. (Cf. *Landeros v. Flood, supra,* 17 Cal.3d at pp. 407, 415, where the court held that the phrase "appears *to the* [*mandated reporter*]" [italics added] requires a finding that the reporter actually formed the opinion that abuse occurred.) In the absence of any evidence that the Legislature had a different intent in selecting that language, we apply the presumption that the Legislature was aware of the holding in *Landeros v. Flood,*[10] and conclude that the Legislature deliberately chose the phrase "reasonably appears" to create an objective rather than a subjective trigger for the duty to report. Thus, the duty to report arises not on the basis of the mandated reporter's personal assessment of the facts known to her, but on the basis of what a reasonable person would suspect based on those facts.

This interpretation also best effectuates the purpose underlying section 15630. The Legislature enacted the Elder Abuse and Dependent Adult Reporting Act (as it was originally entitled) to protect elder and dependent adults from all forms of abuse. (§§ 15600, 15601; *People v. Heitzman, supra,* 9 Cal.4th at pp. 201–204; *ARA Living Centers-Pacific, Inc. v. Superior Court* (1993) 18 Cal.App.4th 1556, 1559–1560 [23 Cal.Rptr.2d 224]; *Delaney v. Baker* (1999) 20 Cal.4th 23, 33 [82 Cal.Rptr.2d 610, 971 P.2d 986].) The legislation was enacted in response to the recognition that dependent adults "could neither speak for, nor protect, themselves" and that elder and dependent adults are in a position analogous to that of children, " 'in that the disabilities of age or a physical or mental condition may make them as helpless at the hands of a caretaking adult as is a small child. In some respects, their position may be even worse than a child's because they are

---

[9] For a number of years prior to the 1994 amendment, section 15630 required a mandated reporter to report "known or suspected abuse" if he "either has actual knowledge that a dependent adult has been the victim of physical abuse, or observes a physical injury to a dependent adult under circumstances that are consistent with physical abuse" where "the dependent adult's statements . . . or other corroborating evidence" indicates "that abuse has occurred." (Stats. 1985, ch. 1120, § 10, p. 3769; Stats. 1985, ch. 1164, § 5, p. 3920.)

[10] *People v. Harrison, supra,* 48 Cal.3d at page 329.

likely to understand fully what is happening, yet lack sufficient control of their circumstances to do anything about it.' [Citation.]" (*People v. Heitzman, supra*, 9 Cal.4th at p. 203.)

The Legislature chose to change the reporting requirement to "reasonable suspicion" in order to "broaden the scope of reportable conditions." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1780 (1997–1998 Reg. Sess.).) Requiring a mandated reporter to report any fact or circumstance which would cause a reasonable person in a like position to suspect abuse results in the broadest possible reporting of suspected abuse, while still limiting the volume of reports by restricting the duty to report to those circumstances in which the suspicion is most likely to be well founded. In contrast, the subjective standard defendant proposes would result in a more limited duty to report suspected abuse. (See *Landeros v. Flood, supra*, 17 Cal.3d at p. 415.) This is incompatible with the statutory goal of ensuring broad reporting of known and suspected abuse. (*People v. Heitzman, supra*, 9 Cal.4th at p. 203.)

### The Act Does Not Allow a Mandated Reporter to Determine That No Abuse Occurred

Defendant takes the position that, because section 15610.65 defines "reasonable suspicion" as "an objectively reasonable suspicion that a person would entertain, based upon facts that could cause a reasonable person in a like position, drawing when appropriate upon his or her training and experience, to suspect abuse," she was not required to report the incident as possible abuse because a person with her training and expertise as a licensed nursing home administrator and with her knowledge of the individuals involved in the incident would have reasonably concluded that McMillan's conduct did not constitute physical abuse.

Defendant is incorrect. Section 15610.65 provides that a mandated reporter may use his or her judgment, based on training and experience, to determine whether it is reasonable to *suspect* abuse, i.e., to determine whether a reasonable person in the same position could have suspected abuse. However, when circumstances giving rise to a reasonable suspicion of abuse exist, the Act does not permit a mandated reporter to investigate and determine that no abuse *occurred*, as defendant contends. On the contrary, the existence of such circumstances triggers the mandatory duty to report the circumstances to a designated outside agency.[11] It is the responsibility of the

---

[11] The Act permits certain mandated reporters to determine that no abuse occurred under two sets of circumstances, neither of which applies to the facts of this case. (§ 15630, subd. (b)(3)(A), (b)(4)(A) (formerly subd. (b)(2)(A) & (b)(2)(B); Stats. 1999, ch. 236, § 1).) Subdivision (b)(3)(A) applies only to a mandated reporter who is a physician and surgeon, a

outside agency to investigate all reports of suspected abuse and to determine whether abuse occurred. (§§ 15610.65, 15630, subd. (b)(1).)

Here, defendant knew that McMillan used force to subdue a patient who was not threatening or engaging in physical violence. As we discuss below, any reasonable mandated reporter would have recognized that McMillan's conduct at least arguably constituted assault, battery or unreasonable physical constraint, all of which are included in the statutory definition of physical abuse. (§ 15610.63, subds. (a)–(d).) Because a reasonable mandated reporter would have at the very least suspected that the incident fell within the statutory definition of physical abuse, defendant had a mandatory duty to report the incident as known or suspected abuse. She was not authorized to determine for herself that it did not constitute abuse.

Neither *People ex rel. Eichenberger v. Stockton Pregnancy Control Medical Clinic, Inc.* (1988) 203 Cal.App.3d 225 [249 Cal.Rptr. 762] (hereafter *Stockton*), on which defendant relies, nor its immediate predecessor, *Planned Parenthood Affiliates v. Van de Kamp* (1986) 181 Cal.App.3d 245 [226 Cal.Rptr. 361] (hereafter *Planned Parenthood*) (see *Stockton* at p. 232), supports defendant's contention that she should have been allowed to apply her expertise to determine that no abuse occurred. Both cases deal with the application of specialized professional expertise to determine whether certain circumstances give rise to a suspicion that abuse occurred; neither case holds that a medical professional faced with circumstances that give rise to an objective basis for suspecting abuse may determine for himself that no abuse actually occurred.[12]

---

registered nurse or a psychotherapist. Subdivision (b)(4)(A) pertains to injuries sustained as a result of care properly provided under a plan of care.

[12] In both cases, the issue was whether Penal Code section 11166, subdivision (a), which contains the same definition of "reasonable suspicion" as does Welfare and Institutions Code section 15610.65, required health care providers to report all instances of sexual activity by minors under the age of 14 as suspected child abuse within the meaning of Penal Code section 288.

In *Planned Parenthood, supra,* 181 Cal.App.3d 245, the court held that the provision for reliance on the mandated reporter's professional expertise "when appropriate" arises from the recognition that in the context of child abuse, practitioners of the professions designated as mandated reporters " 'are presumed to be uniquely qualified to make informed judgments when suspected abuse is not blatant.' [Citation.]" (*Id.* at p. 259.) The court held that because minors under the age of 14 can lawfully engage in consensual sexual activities with minors of a like age, not all sexual conduct involving a 14 year old necessarily constitutes a violation of section 288. Therefore, a doctor is required to report only those conditions which the doctor had reason to know or suspect had resulted from sexual contact between the minor and an older adolescent or an adult. (*Planned Parenthood, supra,* 181 Cal.App.3d at pp. 255, 276, fn. 14, 280, fn. 16, 282.)

For similar reasons, the court in *Stockton* held that an injunction ordering a clinic to report as suspected child abuse every case of pregnancy or sexually transmitted disease in a minor under age 14 was overbroad. (*Stockton, supra,* 203 Cal.App.3d at pp. 238–239.) The court recognized that information about the age of the minor's sexual partner is not medically

Even assuming that defendant's argument could be characterized as asserting that her expertise allowed her to determine that it was not objectively reasonable to suspect abuse, the argument fails. Defendant refers to her knowledge of the victim's history of hallucinations and assaultive behavior, as well as to her knowledge that McMillan was aware of the victim's history. From this, she argues that it was reasonable for her to conclude that McMillan reasonably believed that force was necessary to prevent the victim from harming someone. However, there is no evidence that any such information played a part in defendant's decision not to report the incident.[13] On the contrary, defendant herself testified that she concluded that she did not need to report the incident for two reasons, neither of which depended on her assessment of McMillan's state of mind: first, because the victim was not injured and the incident therefore did not constitute abuse, and second, because she was aware that the Department of Health Services had concluded that a similar previous incident did not constitute abuse. Thus, defendant's expertise as a nursing home administrator and her knowledge of the participants are irrelevant to her defense.

### The Mental State Required for Criminal Liability

We next address defendant's contention that *People v. Superior Court (Holvey)* (1988) 205 Cal.App.3d 51 [252 Cal.Rptr. 335] (*Holvey*)[14] establishes criminal negligence as the mental state for any criminal violation of the Elder Abuse Act. We disagree, and conclude instead that the offense as charged in this case is one of strict liability.

First, *Holvey* does not stand for the sweeping proposition defendant asserts. In *Holvey*, the charged offense was willfully permitting a dependent adult to be injured in violation of Penal Code section 368, subdivision (a). (*Holvey, supra*, 205 Cal.App.3d at pp. 54–55.) Because *Holvey* reached the Court of Appeal on a petition for writ of mandate or prohibition following the overruling of a demurrer, the opinion contains virtually no facts concerning

---

necessary to treat the minor's condition, and held that the provider need not seek out such information. However, the court hypothesized that the provider's training and experience might create a reasonable suspicion of abuse if, for example, it were a fact known to health care providers that some sexually transmitted diseases are "so commonly transmitted by those over age 14 [as opposed to those under 14] that the presence of such a disease in a minor under 14 would, in the absence of any other information, trigger a reasonable suspicion of child abuse." (*Id.* at p. 240.) In that regard, the provider's special expertise would be brought to bear in determining whether a reasonable suspicion of abuse existed.

[13] Defendant's expert witness, Kathy Hurst, based *her* opinion that no abuse occurred on reports which stated that McMillan was aware of the victim's history. From this, she inferred that McMillan had a rational basis for applying force to the victim and thus lacked the "willful intent" to harm the victim.

[14] Defendant erroneously cites the case as *"People v. Holvey."*

the circumstances of the alleged offense. (See *id.* at p. 55, fn. 3.) However, apparently because the complaint alleged that the defendants "permitted" rather than "caused" the injury to the victim, the court held that criminal negligence was the appropriate mens rea. (*Id.* at p. 60.) Similarly, construing Penal Code section 273a, the analogous statute which applies to the abuse of children, the California Supreme Court held that criminal negligence is the mens rea for passively permitting injury to a child within the meaning of that statute, while general criminal intent is the mens rea for directly causing such injury within the meaning of that statute. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215–1224 [81 Cal.Rptr.2d 835, 970 P.2d 409].)

■ Neither case considers the mens rea for a violation of section 15630, however, and an opinion is not authority for any proposition it does not consider. (*In re Jennings* (2004) 34 Cal.4th 254, 269 [17 Cal.Rptr.3d 645, 95 P.3d 906].) Moreover, because the mens rea for any crime is "inextricably linked to the proscribed act or omission" (*People v. Sargent, supra,* 19 Cal.4th at p. 1222), we cannot determine the mens rea required for a violation of section 15630 solely by reference to another statute, even if the two statutes are related or part of a unified statutory scheme. Rather, we must determine what the Legislature intended when it enacted section 15630. (*In re Jennings, supra,* at p. 263.) To do so, we look first to the language of the statute. If the language is unambiguous, its plain meaning controls. If we cannot determine the Legislature's intent solely by reference to the statutory language, we look to the statute's history and interpret it in the context of the statutory scheme of which it is a part. (*Ibid.*)

■ Section 15630, subdivision (h) does not expressly provide for a mens rea for the offense with which defendant was charged. Rather, the statute merely states that "[f]ailure to report physical abuse . . . in violation of this section" is a misdemeanor.[15] Although there is a presumption that penal statutes require some form of "mental fault" (Pen. Code, § 20), with respect to the class of crimes referred to as public welfare offenses, the Legislature often does not intend to require proof of any culpable mental state. Public welfare statutes are regulatory statutes which are designed to protect public health and safety and which carry relatively light sentences. (*In re Jorge M.* (2000) 23 Cal.4th 866, 872 [98 Cal.Rptr.2d 466, 4 P.3d 297].) Their intent is

---

[15] Section 15630, subdivision (h) penalizes both "failure" to report physical abuse and "willful failure" to report physical abuse: "Failure to report physical abuse . . . in violation of this section, is a misdemeanor, punishable by not more tha[n] six months in the county jail or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment. Any mandated reporter who willfully fails to report physical abuse . . . in violation of this section, where that abuse results in death or great bodily injury, is punishable by not more than one year in a county jail or by a fine of not more than five thousand dollars ($5,000), or by both that fine and imprisonment." (Stats. 1999, ch. 236, § 1.) Defendant was charged merely with "failure" to report abuse.

" 'to accomplish the government's objective by mandating certain affirmative acts.' [Citation.]" (*People v. Barker* (2004) 34 Cal.4th 345, 354 [18 Cal.Rptr.3d 260].) Although criminal sanctions are relied upon, the primary purpose of the statutes is regulation rather than punishment or correction. Thus, the offenses are not crimes in the orthodox sense, and wrongful intent is not required in the interest of enforcement. (*In re Jorge M., supra,* 23 Cal.4th at p. 872; *In re Jennings, supra,* 34 Cal.4th at p. 267.)

Section 15630 is primarily a regulatory statute. The history of the Elder Abuse Act, discussed in detail earlier in this opinion, makes it clear that its purpose is the protection of a large and vulnerable segment of the public. (*People v. Heitzman, supra,* 9 Cal.4th at pp. 201–204; §§ 15600, 15601.) Section 15630 addresses itself primarily to the circumstances under which different mandated reporters are required to report known or suspected abuse, to designating the agencies to which such reports are to be made, and to the duties of the investigative agencies to which the reports must be made. (§ 15630, subds. (a), (b), (d), (e), (f), (g).) The enactment of such a comprehensive statutory scheme, which not only requires designated professionals to report known or suspected abuse but also sets up a system of outside agencies mandated to investigate reports of such abuse, amply demonstrates the scope and severity of the problem of elder and dependent adult abuse as perceived by the Legislature. Like other public welfare statutes, its intent is " 'to accomplish the government's objective by mandating certain affirmative acts.' [Citation.]" (*People v. Barker, supra,* 34 Cal.4th at p. 354.) Thus, we can infer that the Legislature provided for criminal penalties primaqrily to encourage compliance with the Act's regulatory provisions.

The wording of section 15630, subdivision (h) also supports the conclusion that the Legislature intended the violation charged in this case to be a strict liability offense. Subdivision (h) explicitly differentiates between "failure" to report abuse and "willful failure" to do so: *"Failure to report physical abuse* . . . in violation of this section, is a misdemeanor, punishable by not more tha[n] six months in the county jail, by a fine of not more that one thousand dollars ($1,000), or by both that fine and imprisonment. Any mandated reporter who *willfully fails* to report physical abuse . . . , where that abuse results in death or great bodily injury, is punishable by not more than one year in a county jail or by a fine of not more than five thousand dollars ($5,000) or by both that fine and imprisonment." (Stats. 1999, ch. 236, § 1, italics added.)

■ The word "willfully" as generally used in the law is a synonym for "intentionally," i.e., the defendant intended to do the act proscribed by the penal statute. "Willfully" usually defines a general intent crime unless the statutory language expresses or implies another meaning. (*People v. Lewis*

(2004) 120 Cal.App.4th 837, 852 [15 Cal.Rptr.3d 891].) In a criminal statute that penalizes the failure to perform a legally imposed duty, "willfulness" also denotes a requirement of proof that the defendant knew of his duty to act: a failure to act cannot be intentional or purposeful unless the defendant knew he was under a duty to act. (*People v. Garcia* (2001) 25 Cal.4th 744, 752 [107 Cal.Rptr.2d 355, 23 P.3d 590].) ■ A basic rule of statutory interpretation is that we give statutory language its usual meaning and accord significance to every word and phrase, if possible. (*Dyna-Med, Inc. v. Fair Employment and Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) ■ Furthermore, " 'where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes.' [Citation.]" (*In re Jennings, supra,* 34 Cal.4th at p. 273.) The juxtaposition of a willful violation of section 15630, i.e., one requiring both knowledge and general criminal intent, with a nonwillful violation with no expressed mens rea, supports the inference that the Legislature intended the latter offense to be one of strict liability, particularly in light of the regulatory nature of section 15630 and of the Elder Abuse Act as a whole.

An additional consideration which supports this conclusion is that the penalty for a nonwillful violation of section 15630 is relatively light. (*In re Jennings, supra,* 34 Cal.4th at p. 267.) The maximum penalty for a nonwillful violation of section 15630 is both a fine of $1,000 and confinement for a maximum of six months. (§ 15630, subd. (h).) Although this is a greater penalty than that imposed for most strict liability public welfare offenses (see *In re Jennings, supra,* at pp. 273–274), it is less than the maximum punishment for misdemeanors, which may result in imprisonment for up to one year (Pen. Code, § 19.2), and neither the fine nor any period of confinement is mandatory. Indeed, defendant received probation with the condition of 500 hours of community service, and no fine. In *In re Jennings,* the California Supreme Court examined Business and Professions Code section 25658, subdivision (c), which makes it a misdemeanor to purchase an alcoholic beverage for a person under the age of 21 years, who, after drinking, proximately causes death or great bodily injury. A violation of that section is punishable by imprisonment in a county jail for a "minimum term of six months not to exceed one year," a fine not exceeding $1,000, or by both imprisonment and fine. The court held that this punishment was not so severe as to require a presumption that the Legislature intended to impose a mens rea element as a prerequisite to criminal liability. (*In re Jennings, supra,* 34 Cal.4th at pp. 273–274.) Similarly, the punishment for a violation of Welfare and Institutions Code section 15630 is not so severe as to require us to presume that the Legislature intended to impose a mens rea element.

Finally, the absence of mens rea is consistent with the underlying purpose of the Elder Abuse Act. As we discussed in detail earlier in this opinion, its purpose is to mandate the broadest possible reporting of incidents of known and suspected abuse of elder and dependent adults. (See, *ante*, pp. 1425–1431.) Imposing criminal liability for failure to report, without regard to intent or negligence, promotes this goal.

For all of these reasons, we conclude that a conviction of violation of section 15630 does not require proof of any culpable mental state. Rather, if the defendant knew that abuse occurred, or if she knew of facts giving rise to a reasonable suspicion that abuse occurred, she had a mandatory duty to report to the appropriate authority. (§ 15630, subds. (b), (h).) Neither negligence nor criminal intent is required.

*Substantial Evidence Supports the Judgment*

If there is substantial evidence to support the judgment, we must affirm. We view the record in the light most favorable to the judgment, resolving all conflicts and indulging all reasonable inferences in support of the judgment. We do not substitute our judgment for that of the trier of fact with respect to the credibility of witnesses. If there is more than one inference which may reasonably be drawn from the evidence, we accept the inference which supports the judgment. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Johnson* (1980) 26 Cal.3d 557, 575–578 [162 Cal.Rptr. 431, 606 P.2d 738].) Here, substantial evidence supports the judgment on any one of three legal theories.

Defendant's Knowledge of Facts Giving Rise to an
Objectively Reasonable Suspicion That Abuse Occurred.

Licensed professionals who are mandated reporters by virtue of their profession are trained to understand what constitutes physical abuse.[16] Vista Pacifica provided such training to its employees, and defendant's own training to become a licensed nursing home administrator included training on recognizing and reporting abuse. Training in recognizing abuse necessarily includes knowledge of the statutory definitions of physical abuse. As relevant here, Welfare and Institutions Code section 15610.63 defines physical abuse

---

[16] Such professionals are provided information concerning reporting requirements, either upon issuance of the license or in connection with the application for the license. (§ 15659, subds. (d), (e).) Long-term health care facilities, such as Vista Pacifica, are also required to provide training to all employees in recognizing abuse and in the reporting requirements set out in section 15630. (§ 15655, subd. (a)(1).)

as any of the following: assault, as defined in section 240 of the Penal Code; battery, as defined in section 242 of the Penal Code; assault with a deadly weapon or force likely to produce great bodily injury, as defined in section 245 of the Penal Code; or unreasonable physical constraint.[17] (Welf. & Inst. Code, § 15610.63, subds. (a)–(d).)

■ The Act does not require a mandated reporter to know whether conduct actually violates Penal Code section 240, 242 or 245, subdivision (a). It suffices that a reasonable mandated reporter would recognize conduct that *might* violate one of those statutes. If the conduct might violate one of those statutes, an objective basis for suspecting abuse exists. The conduct Roberts described in her report—using physical force, including choking, on the victim, even though the victim was merely speaking calmly to Roberts and was not engaged in any threatening conduct toward Roberts or toward McMillan—at least arguably constituted battery, assault by means of force reasonably likely to result in great bodily injury, or "unreasonable physical constraint" within the meaning of Welfare and Institutions Code section 15610.63, subdivision (d). Contrary to defendant's assertion at trial, it is irrelevant that the victim was not injured. The infliction of injury is not a part of the definition of assault, battery or assault by means of force likely to produce great bodily injury. (Pen. Code, §§ 240, 242 , 245, subd. (a).) Nor is it implied in the concept of "unreasonable physical constraint." Thus, any reasonable mandated reporter would recognize that these facts give rise to an objectively reasonable suspicion that abuse occurred. ■ Substantial evidence therefore supports the verdict on the basis of defendant's failure to report an objectively reasonable suspicion of abuse within the meaning of Welfare and Institutions Code sections 15630 and 15610.65.[18]

### Defendant's Actual Knowledge That Abuse Occurred

■ In addition to finding that defendant should have suspected abuse, the trial court found that defendant knew the incident amounted to physical abuse and deliberately chose not to report it. Failure to report known abuse is also a violation of section 15630. (§ 15630, subd. (b)(1) [mandated reporter "shall report the known or suspected instance of abuse . . . ."].)

---

[17] Penal Code section 242 defines battery as "any willful and unlawful use of force or violence upon the person of another." Assault by means of force likely to result in great bodily injury is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another" by means of force likely to produce great bodily injury. (Pen. Code, §§ 240, 245, subd. (a).)

[18] Defendant asserts that the trial court improperly relied on its finding that abuse actually occurred to find that there was an objective basis for suspecting abuse. Defendant is correct that whether abuse did occur is a different question than whether a reasonable person in her position would have suspected that it might have occurred. However, we fail to see how the finding that abuse *did* occur conflicts with the finding that defendant should have recognized that abuse *might* have occurred.

Substantial evidence supports the court's conclusion. Defendant is an experienced administrator who was trained in recognizing and reporting abuse. Grabbing and choking a person who is not engaged in any assaultive or threatening behavior is battery and assault by means of force likely to produce great bodily injury, as the trial court found. These facts alone support the inference that defendant knew McMillan's conduct constituted physical abuse. In addition, several nurses who were employed by Vista Pacifica at the time of the incident, all of whom were also mandated reporters, testified that they understood choking a patient to be physical abuse and understood that they had an obligation to report it. Also, defendant fired McMillan for misconduct, and told Dr. Elliot, one of the physicians who examined the victim after the incident, that the incident involved "suspected staff abuse." Finally, there was evidence that defendant said she did not intend to report the incident because Vista Pacifica was "in enough trouble already with the state" and that defendant had instructed a staff member not to report another instance of abuse. This evidence amply supports the inference drawn by the trial court, that defendant knew McMillan's conduct constituted abuse and deliberately chose not to report it.[19]

### Duty to Report Abuse as Reported by a Dependent Adult

A third theory on which defendant's conviction could be sustained is that the victim reported conduct which constituted abuse. Section 15630 mandates reporting if the reporter "is told by an elder or dependent adult that he or she has experienced behavior . . . constituting physical abuse." (§ 15630, subd. (b)(1).) The victim reported to Edward Hodge, whom defendant delegated to investigate the incident, that McMillan had choked him. Hodge reported that statement to defendant in a written report. Based on that report alone, defendant had an obligation to report the victim's allegations.

---

[19] At trial, defendant testified that she relied in part on a prior similar incident, which she did report and which the Department of Health investigated and found not to constitute abuse. Based on that knowledge, she deemed the current incident not to constitute abuse. She does not refer to that evidence in support of her arguments on appeal. We note, however, that while defendant and Cheryl Jumonville described the incident as one in which a single staff person did a "takedown" and applied a chokehold to a patient, the only evidence concerning the circumstances which led to the "takedown" and the application of the chokehold indicated that the patient might have been behaving aggressively enough that the staff member's response was justified. The distinction, of course, is critical. Even if the staff member's actions were identical to those in this case, they did not constitute abuse if they were justified. Moreover, even if defendant thought McMillan's conduct might have been justified, the Act did not authorize her to make that determination.

## DISPOSITION

The conviction is affirmed.

Hollenhorst, J., and Gaut, J., concurred.

A petition for a rehearing was denied March 15, 2005.