[No. D017377. Fourth Dist., Div. One. July 16, 1993.]

JAMES W. et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
KATHLEEN GOODFRIEND et al., Real Parties in Interest.

■■■■■■■■

**COUNSEL**

Milton J. Silverman for Petitioners.

No appearance for Respondent.

Eugene P. Kenny, Gina Lacagnina, James McFall, Neil, Dymott, Perkins, Brown & Frank and Lewis A. Present for Real Parties in Interest.

**OPINION**

**BENKE, J.—**

### FACTUAL AND PROCEDURAL BACKGROUND[1]

1. *The Report of Child Abuse*

On the morning of May 9, 1989, eight-year-old Alicia W. complained of pain when she went to the bathroom. Her parents brought her to the Navy medical unit by 8:30 a.m. The family was then escorted to Children's Hospital where staff determined Alicia had been raped and sodomized, and filed a report under the Child Abuse and Neglect Reporting Act. Alicia stated that a man had come through the bedroom window and hurt her.

Late that afternoon, a hospital worker and detective accused Alicia's father of the molest. In an attempt to prove the father's innocence, the parents agreed to have their home searched and talk with the police, and the father submitted to a rape test, a DNA test and three polygraph tests.

2. *The Defendants' Conduct*

By May 11, the department of social services (DSS) filed a dependency petition and the following day had Alicia placed in temporary foster care.

---

[1]We review the order sustaining the demurrers accepting as true all properly pleaded material facts in the 174-page complaint without regard to possible difficulty of proof. (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

Meanwhile, DSS investigative employee Diane Anderson interviewed the parents and referred them to a private family counselor, Kathleen Goodfriend. At her first session with the family on May 11, Goodfriend accused the father of the assault.

The civil complaint filed by Alicia's family characterizes this as the start of a two-and-one-half-year campaign to convict the father and have Alicia adopted, a campaign that included concealing evidence and inducing confessions and accusations by fraud, coercion, and perjury. Among other things, the family alleges they later discovered: (1) in May 1989, a man named Carder entered a bedroom window across the street from where the family was living, abducted a four-year-old girl and attempted to rape her; (2) Carder, a registered sex offender, was arrested in June 1989; (3) DSS investigator Anderson and family counselor Goodfriend were aware of the Carder molest; (4) in early July 1989, Jane Via, the deputy district attorney prosecuting Carder, discussed the Carder case with Goodfriend; (5) by August 1989, the deputy district attorney was prosecuting four criminal cases involving minors against Carder; (6) the deputy district atorney took over Alicia's case in juvenile court for the county counsel's office; (7) in June 1990, after learning Carder had been positively identified by DNA testing in the rape of a four-year-old and that the detective now had reservations about Alicia's father's guilt, the DSS worker and Goodfriend discussed ways to twist the detective's statements; and (8) in August 1991, the deputy district attorney was not truthful about the facts in the Carder molest cases.

None of this was known by the parents, however, who first appeared in juvenile court in May 1989. In July 1989, Attorney Lewis Present advised them to plead nolo contendere to a charge of neglect[2] and assured them all other charges would be dropped. Present added that, assuming the parents passed a psychological evaluation and found a 24-hour caretaker, Alicia would be home in a week. The parents reluctantly accepted the plea bargain[3] to get their daughter home and put the experience behind them. Notwithstanding that the psychological exam was favorable and the family provided the names of three caretakers (including Alicia's grandmother) to Anderson, counselor Goodfriend refused to cooperate and misrepresented facts to the court, and the DSS later backed out of the agreement.

---

[2] According to the complaint, when DSS worker Anderson turned over her logs to Attorney Present two days before trial in July 1989, she had "whited out" information tending to exculpate the father—i.e., references to the Carder molest and the fact that Alicia had never wavered in her story.

[3] The complaint also pleads claims against the family's lawyers. The family alleges, among other things, that Attorney Present failed to advise the parents that the erroneous report of DSS worker Anderson would be admitted into evidence to support the nolo plea, and later failed to move to set the plea aside when the county refused to abide by the plea bargain.

Meanwhile, for over a year after the attack, Alicia stood firm in her insistence that her father was not the assailant. On May 9, 1989, the day she was first examined, Alicia told the Children's Hospital worker and two detectives that a man had come through the bedroom window. In June 1989, she told her temporary foster mother that her dad did not assault her, and the foster mother in turn relayed the information to DSS worker Anderson and counselor Goodfriend.

Soon after she was placed with the Gregorys[4] in July 1989, however, pressure was mounted to get Alicia to say her father was the perpetrator. Directing Alicia to say her father was guilty, Goodfriend repeatedly told the child: (1) she knew Alicia's father had molested her; (2) Alicia would feel a lot better if she admitted it; (3) the "story" Alicia had been telling was not believable; (4) Alicia's mother had been assaulted by Alicia's grandfather; and (5) if she wanted to go home, Alicia would have to say her father was the perpetrator. At Goodfriend's direction, Mrs. Gregory also took Alicia to the bedroom "every night" and said "over and over again" Alicia's father had raped her. Mrs. Gregory kept telling Alicia she would have to say her father was the perpetrator if she wanted to go home.

At the same time, the child was completely cut off from her family. In October 1989, the court found reunification in Alicia's best interests, ordered there be no discussion of adoption with the child, and set weekly visitation with the parents. However, Goodfriend and the Gregorys refused to follow court orders[5] with the result that Alicia's mother did not see her for a full year and her father did not see her for two years.

By spring 1990, the juvenile court judge wanted to talk to Alicia in chambers,[6] the police were anxious to have Alicia attend a lineup with Carder present, and a contested disposition hearing was imminent. Goodfriend's May 1990 notes say "I'm really starting to put the pressure on now" and "she's almost ready to tell." Under intense pressure from Goodfriend and the Gregorys to change her story and reminded this was the only way she could go home, Alicia yielded at the end of June 1990, finally telling the Gregorys that her father was guilty, and the Gregorys in turn "reported" it. Coached by Goodfriend and Mrs. Gregory, Alicia testified against her father in July.

---

[4]The Gregorys were a foster-adopt home and interested in permanently adopting Alicia.

[5]According to the complaint, when DSS worker Anderson was called to task for not complying with visitation orders, Goodfriend falsely informed the court that Alicia had improved when the family's contact was restricted.

[6]The complaint alleges that Goodfriend and the Gregorys were fearful the judge would hear Alicia's desperate pleas to go home and so stepped up their efforts to get Alicia to accuse her father.

In September 1990, Goodfriend began "conjoint" therapy with Alicia, Alicia's mother and younger brother Joshua. As part of the therapy, Goodfriend: (1) ordered the mother to treat the father as if he were "dead" when Alicia was present; (2) accused the mother in front of her young son Joshua of participating in Alicia's rape; and (3) informed Alicia without first obtaining the mother's consent that Alicia's mother had been raped by Alicia's grandfather. By November 1990, the mother was so overwhelmed that she attempted suicide and was confined to a locked psychiatric ward where she stayed until January 1991.

Meanwhile, in December 1990, a month after the mother's suicide attempt, the father was arrested and charged with raping and sodomizing Alicia. New counsel for the father moved for further tests based on later discovery of stains on Alicia's nightgown the first criminalist from the San Diego police department had missed;[7] he also moved to reopen the juvenile court proceedings based on the new evidence.

In August 1991, in response to the attempt to reopen the juvenile case, the deputy district attorney (having left the district attorney's office to join the county counsel) allegedly was not truthful about the facts of the Carder assaults. In concert with Goodfriend and the Gregorys, Via also moved to have Alicia permanently adopted by the Gregorys. Shortly before the hearing, however, the new forensic expert, Dr. Ed Blake, completed his tests and the results showed Alicia could not have been raped by her natural father.

On October 15, 1991, the court halted adoption proceedings, ordered that steps be taken to reunite Alicia with her family, and removed Goodfriend as therapist. On October 17, Dr. Blake excluded the father as the assailant by DNA testing and declared that Carder's blood type fell into the 9 percent of the population of possible donors for Alicia's rape. On November 15, the court found good cause to grant the family's petition to vacate the nolo plea. All charges against the father were dropped.

### 3.   *The Family's Suit*

The family filed suit on January 31, 1992, and later amended their complaint to allege 69 causes of action against Goodfriend, the Gregorys and the family's former lawyers, among others. Goodfriend, the Gregorys and Attorney Present demurred and moved to strike.

---

[7]According to the complaint, although the district attorney prosecuting the father for rape discovered in March 1991 that the expert who previously examined Alicia's gown missed a semen stain, he did not disclose it to the father's counsel at that time.

The trial court sustained the demurrers without leave to amend to all but nine causes of action.[8] Demurrers to the vast majority of the causes of action were sustained based on the Child Abuse and Neglect Reporting Act. The court also sustained demurrers to selected causes of action under the foster care placement statute, the abduction statute and statute of limitations; and it granted the motion to strike as to two paragraphs.

### 4. *This Petition*

In this petition for writ of mandate, the family argues the courts have moved beyond the Child Abuse and Neglect Reporting Act, Penal Code section 11164 et seq., to come full circle so those who abuse children in the name of preventing abuse are immunized by the very law that was meant to protect children. The family also challenges various other rulings.

We deny the petition with respect to whether the statute of limitations bars malpractice claims against Attorney Present who remains in the case on a fraud cause of action, whether Goodfriend and the Gregorys may also be liable under the foster care placement statute or the abduction statute, and whether the court properly struck 2 paragraphs from this 174-page, 559-paragraph complaint. ▮ Appellate courts simply do not have the time or resources to police law and motion rulings on the pleadings through the mandamus power and, absent unusual circumstances, decline to do so. As the Supreme Court explains: "[W]e perform such a function of intermediate review with extreme reluctance. 'In most . . . cases, as is true of most other interim orders, the parties must be relegated to a review of the order on appeal from the final judgment. [Citation.] However, upon occasion our

---

[8]Explaining "the immunity created by Penal Code section 11172 should not extend [to] intentional torts committed by the health care practitioner against her minor patients," the trial court overruled demurrers to the following: Alicia's 29th cause of action for intentional infliction of emotional distress against Goodfriend; Joshua's 30th cause of action for intentional infliction of emotional distress against Goodfriend; Alicia's 37th cause of action for conspiracy to intentionally inflict emotional distress against Goodfriend; Alicia's 41st cause of action for fraud against Goodfriend; Joshua's 42d cause of action for fraud against Goodfriend; Alicia's 62d cause of action for false imprisonment against Goodfriend; and Joshua's 64th cause of action for false imprisonment against Goodfriend. We note, however, Penal Code section 11172, subdivision (a) provides that mandatory reporters are not subject to *any* civil or criminal liability and know of no special exception for "minor" patients.

The court also overruled demurrers to Alicia's 33d cause of action for intentional infliction of emotional distress against Mrs. Gregory, Alicia's 37th cause of action for conspiracy to intentionally inflict emotional distress against Mrs. Gregory, and Alicia's 63d cause of action for false imprisonment against Mrs. Gregory, noting that these causes of action "are not premised upon a communication and actions are alleged which go beyond 'conduct giving rise to the obligation to report.' "

Apart from the above mentioned claims, the only cause of action to survive the demurrers was the father's cause of action against Attorney Present for fraud.

attention is drawn to instances of such grave nature or of such significant legal impact that we feel compelled to intervene through the issuance of an extraordinary writ. [Citation.]" (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379].) The question of whether Goodfriend and the Gregorys enjoy immunity under the Child Abuse and Neglect Reporting Act does, however, present such an issue and is appropriate for review by way of extraordinary writ.

## DISCUSSION

Penal Code[9] section 11172, subdivision (a) of the Child Abuse and Neglect Reporting Act (Act) provides in pertinent part: "No child care custodian,[10] [or] health practitioner[11] . . . who reports a known or suspected instance of child abuse shall be civilly or criminally liable for any report required or authorized by this article." While it is true the courts have broadly interpreted the immunity under the Act, we find the statutory protection does not extend to the conduct of Goodfriend and the Gregorys alleged in this complaint. The Act is a reporting statute and its protection runs to reporting: it does not apply to activities that continue more than two years after the initial report of abuse by parties who are not acting as reporters.

### Statutory Framework

The historical background of the Act from the passage of former section 11161.5 in 1963 to the present leads us to the conclusion that neither Goodfriend nor the Gregorys are immunized. The role of the reporting statutes was to bring cases of suspected child abuse to the attention of public authorities so the authorities could intervene as early as possible. (Wooster, *The California Legislative Approach to Problems of Willful Child Abuse* (1966) 54 Cal.L.Rev. 1805, 1809.) Notwithstanding statutory changes in 1965 and the following years, problems nevertheless persisted because ambiguous reporting standards in early versions of the law deterred professionals from reporting suspected cases of child abuse. (*Krikorian* v. *Barry* (1987) 196 Cal.App.3d 1211, 1216 [242 Cal.Rptr. 312].) As the *Krikorian* case notes, as late as November 1978 a state Department of Justice official testified that, despite enactment of a mandatory child abuse reporting act, "as few as 10 percent of all cases of child abuse were being reported to responsible government agencies." (*Id.*, at pp. 1216-1217.)

---

[9]All further statutory references are to the Penal Code unless otherwise specified.

[10]As foster parents, the Gregorys are "child care custodians" under section 11165.7, subdivision (a).

[11]Family counselor Goodfriend is a "health practitioner" under section 11165.8.

In the 1980 revision and subsequent amendments, we see the legislative solution—a comprehensive reporting scheme aimed at increasing the likelihood that child abuse victims are identified. (*Ferraro* v. *Chadwick* (1990) 221 Cal.App.3d 86, 90 [270 Cal.Rptr. 379], citing Stats. 1980, ch. 1071, § 4, p. 3420 et seq.) The Act "requires persons in positions where abuse is likely to be detected to report promptly all suspected and known instances of child abuse to *authorities for follow-up investigation.*" (*Ferraro* v. *Chadwick, supra,* 221 Cal.App.3d at p. 90, italics added.) It also removes potential liability for mandated reporters by deleting the pre-1980 exception for reports which the reporter " 'knew or should have known . . . [were] false.' " (*Krikorian* v. *Barry, supra,* 196 Cal.App.3d at p. 1217.)

The statutory framework imposes specific duties on mandated reporters within shortened time frames: they must report known or suspected instances of child abuse to a child protective agency by telephone immediately or as soon as practically possible, and prepare and send a written report within 36 hours. (§ 11166, subd. (a).) It also defines what must be reported: the name and present location of the child, the nature and extent of injury, and other information requested by the child protective agency. (§ 11167, subd. (a).)

Once a report is made, responsibilities shift and governmental authorities take over. Proceeding up the line, the Act requires county welfare departments to report suspected child abuse by telephone immediately or as soon as practically possible to the appropriate law enforcement agency, the agency responsible for Welfare and Institutions Code section 300 investigations, and the district attorney. (§ 11166, subd. (g).) The welfare department must follow-up the call with a written report to the same agencies within 36 hours of receiving the information. (§ 11166, subd. (g).) The Act also imposes reciprocal duties on law enforcement agencies who first receive a report. (§ 11166, subd. (g).)

The focus of the Act is, as such, directed toward discovering suspected child abuse and, to that end, encouraging reporters to spread the word as quickly as possible without fear of suit so that independent governmental agencies can remove the child from immediate danger and investigate. The Act was satisfied here on May 9, 1989, when officials at the hospital determined eight-year-old Alicia had been raped, filed a report, and enabled the county to file a petition and remove Alicia from her home. The activities of Goodfriend and the Gregorys for the next two and one-half years went far beyond anything contemplated by statute.

*Postreporting Cases*

Even though their activities occurred after the original report, Goodfriend and the Gregorys contend the Act nevertheless immunizes them. They rely

on *Thomas* v. *Chadwick* (1990) 224 Cal.App.3d 813 [274 Cal.Rptr. 128] and *Ferraro* v. *Chadwick, supra*, 221 Cal.App.3d 86.

In *Thomas*, a two-month-old boy was examined by a doctor who failed to recognize he was suffering from a congenital defect. The doctor diagnosed the boy as having injuries of a nonaccidental nature which could only have resulted from a violent shaking or a fall and, because of the suspicion of child abuse, the hospital filed a report. The infant died in four days. A few weeks later, the hospital sent a letter informing the district attorney of the death, restating the erroneous diagnosis and urging removal of the family's other child. We held the subsequent letter was an "authorized" report and immunized by the act.

In *Ferraro*, a three-year-old child fell down steps and died a day later. The doctor stated it was probable the boy was left untreated for a substantial period of time, the family fabricated his preadmission medical history, and the parents had battered the boy or engaged in violent criminal behavior. The statements were republished five or six times. Again, we held the republications were "authorized" reports immunized by the Act.

These cases are a far cry from what happened here. The most obvious distinction is that the postreporting activities in *Thomas* and *Ferraro* were simply restatements or republications of the initial report of suspected child abuse. It would be anomalous to construe the Act as absolutely immunizing the "required" initial report and yet construe later republications of the same statements as exposing the reporter to civil liability. (*Thomas* v. *Chadwick, supra*, 224 Cal.App.3d at p. 822.)

Going a step beyond recognizing the anomaly of such a construction, the *Thomas* and *Ferraro* cases interpret the republications to be immunized as "authorized"—as opposed to "required" reports—because the Legislature contemplated follow-up between the original reporter and the governmental agency. That is not to say, however, that all postreporting conduct by other individuals is immunized.

The Act is, as we have said, a reporting scheme to increase the likelihood that child abuse is identified and reported to authorities for investigation. (*Ferraro* v. *Chadwick, supra*, 221 Cal.App.3d at p. 90.) Identification of abuse—not identification of the perpetrator—is the chief concern. While statutes in other states may require the doctor to disclose the identity of the perpetrator, the California Act has never done so.

To the contrary, identifying the perpetrator is the work of authorities investigating the abuse and the criminal justice system. For doing that job,

the actors have certain immunities. District attorneys have comprehensive prosecutorial immunities.[12] (See Gov. Code, § 821.6; *Harmston* v. *Kirk* (1989) 216 Cal.App.3d 1410, 1413-1416 [265 Cal.Rptr. 548].) A variety of immunities apply to authorities who investigate the abuse depending on whether their activities are necessary to a proper investigation. (See *Newton* v. *County of Napa* (1990) 217 Cal.App.3d 1551, 1558-1559 [266 Cal.Rptr. 682].) Persons coming forward who take the stand and testify may also have immunity. (See Civ. Code, § 47, subd. (2); *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 363-364 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417].) But none of these activities are themselves reporting or within the scope of the Act's immunity.

By way of example, in *Newton* v. *County of Napa, supra*, 217 Cal.App.3d 1551, deputy sheriffs, a probation officer and a social worker came to a family's home, took the children into the bathroom without parental consent, directed the children to undress and examined them for evidence of abuse. ▮ Rejecting application of the Act to authorities who receive and investigate reports of abuse, the court explained: "The Child Abuse and Neglect Reporting Act serves to encourage and regulate the reporting of suspected child abuse; the immunity conferred by Penal Code section 11172 refers by its terms only to persons making such reports. While the policy . . . of broadly construing this grant of immunity may arguably also be found in other closely related statutes, the statutory language itself extends only to persons reporting child abuse to governmental authorities; *it does not apply to actions taken by officials who receive such reports of abuse*." (*Newton* v. *County of Napa, supra*, at p. 1558, italics added.) Officials who receive reports may have qualified immunities under other statutes, said the court, but they are not entitled to the absolute immunity of section 11172, subdivision (a). (*Newton* v. *County of Napa, supra*, 217 Cal.App.3d at pp. 1558-1559.)

▮ Here, neither Goodfriend nor the Gregorys identified or reported child abuse: the hospital staff, like the doctor in *Thomas* and *Ferraro*, did that. Nor were Goodfriend and the Gregorys simply republishing an initial report as in *Thomas* and *Ferraro*. To the contrary, Goodfriend and the Gregorys came onto the scene after the fact—after child abuse had been positively identified and reported. They voluntarily assumed roles of those who, having received the report and determined the identity of the perpetrator, search for corroboration and/or attempt to pressure a witness to get a conviction. Because Goodfriend and Gregory were not acting as reporters they, like any number of other public officials who may be protected under other laws, may not take advantage of the reporting act immunity. (See *Newton* v. *County of Napa, supra*, 217 Cal.App.3d 1551.)

---

[12]But see *Buckley* v. *Fitzsimmons* (1993) 509 U.S. __ [125 L.Ed.2d 209, 113 S.Ct. 2606].

We believe recognition of a dichotomy between reporter and reportee, i.e., differentiating between those who make the initial report and the officials who come later, is a healthy distinction. It discourages family counselors and foster parents from taking on roles they are not adequately prepared to perform. When private citizens become deeply enmeshed in investigatory or prosecutorial activities and take on functions of the police, the DSS, county counsel or district attorney, the system suffers a loss of objectivity, independence, balance and accountability. The combination of private players and public officials all on one side performing the same roles, albeit for different reasons, has a momentum of its own which can, in its own way, overwhelm any family. Such an imbalance leading to grievous injury is precisely the problem alleged in this complaint.

*Expanded Immunity Cases*

Finally, we examine the "expanded immunity concept" carved out in *Krikorian* v. *Barry, supra,* 196 Cal.App.3d 1211. In *Krikorian,* families sued the owner of a preschool and his staff for sexually molesting the children; and the owner in turn cross-complained against a clinical psychologist hired by the parents for using improper techniques in attempting to determine whether the children had been sexually abused. Deciding the psychologist was absolutely immune not just for the act of reporting the abuse but also the activities she engaged in leading up to her report, the court explained: "[I]n most cases, mandatory child abuse reporting will be preceded by the rendering of professional services by the party making the report. It strains credulity to suggest that the Legislature intended that immunity be granted for the act of reporting but not for the rendering of professional services resulting in the identification of a suspected case of child abuse." (*Krikorian* v. *Barry, supra,* 196 Cal.App.3d at p. 1223.) Expanded immunity was likewise applied to the activities of an independent professional corporation and officer hired by the authorities to investigate whether children had been victims of abuse and to advise the district attorney. (*McMartin* v. *Children's Institute International* (1989) 212 Cal.App.3d 1393, 1401 [261 Cal.Rptr. 437].)

At the outset, we note that we found no cases where foster parents received the benefit of expanded immunity. Nor can we conceive of any valid reason for extending immunity beyond the forensic psychologists and staff in *Krikorian* and *McMartin* to nonprofessionals such as the Gregorys who were not treating a suspected victim preliminary to a determination of child abuse and were not professionally qualified to do so.

There are, of course, other serious problems in applying the expanded immunity concept here. For one thing, in *Krikorian* and *McMartin,* professional counselors were hired to determine whether in fact the children had

been sexually abused. (*Krikorian* v. *Barry, supra,* 196 Cal.App.3d at p. 1213; *McMartin* v. *Children's Institute International, supra,* 212 Cal.App.3d at p. 1398.) There was never any question about Alicia. The hospital had proof positive that she had been raped and sodomized and everyone, Goodfriend and the Gregorys included, knew it.

Even more critical, in contrast to the forensic experts in *Krikorian* and *McMartin,* Goodfriend was a *treating* therapist. By her own admission, she rendered psychotherapeutic services to Alicia for a considerable period— mid-May 1989 through October 1991—long after the molest had been reported. Goodfriend also provided "conjoint" therapy to Alicia, her mother and younger brother starting in September 1990. The complaint alleges the mother tried to kill herself and was institutionalized for three months as a result of sessions in which Goodfriend advised the mother to treat the father as if he were dead, accused the mother in front of her young son of participating in Alicia's rape, and told Alicia without first obtaining consent that Alicia's mother was raped by her own father.

This therapeutic relationship leads us to the other side of the equation. In *Krikorian* and *McMartin,* the counselors were not sued by the victims and families they examined. Goodfriend, however, has been sued by her patients. ▪ The law recognizes that, where counselors abuse a therapeutic relationship with family members, causing injury to the children, emotional distress to the parent, and disrupting the parent-child relationship, they breach their duties of care to the parent as well as the children and are liable to both. (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 591 [257 Cal.Rptr. 98, 770 P.2d 278].)

▪ As the child's therapist, Goodfriend had duties of care running directly to Alicia. Once conjoint therapy began in September 1990, Goodfriend had duties to the mother and Joshua as well. (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at p. 591.) By allegedly abusing the therapeutic relationship, Goodfriend breached her duty to both the mother and children. (*Ibid.*) To allow Goodfriend to escape the liability imposed on the counselor in *Marlene F.* is to penalize families who, however reluctantly, enter the juvenile justice system.

In short, the differences between *Krikorian, McMartin* and this case outweigh any arguable similarities. Whatever justifications exist for extending the immunity of the reporting act to forensic teams investigating whether a child has actually been abused, they are clearly not present here.

CONCLUSION

In the final analysis, the conduct alleged in this complaint falls beyond the reach of the reporting act. Goodfriend and the Gregorys had nothing to do

with the child abuse identified and reported at the outset by the hospital. Their alleged coercion of Alicia continued over the next two and one-half years—long after any "emergency" had passed, after Alicia was out of harm's way, and after the authorities were actively involved, investigating and prosecuting. To hold such conduct protected is to immunize virtually anyone coming in contact with an abused child. We do not believe such an interpretation is warranted by the reporting statute.

Let a writ of mandate issue directing the superior court to vacate the order sustaining the demurrers without leave to amend and enter an order consistent with this opinion. In all other respects, the petition is denied.

Wiener, Acting P. J., and Nares, J., concurred.

On August 16, 1993, the opinion was modified to read as printed above.