Filed 7/22/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MARIA DELALUZ SANTOS, | D067929 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2013-00057882-CU-PO-NC) |
| KISCO SENIOR LIVING, LLC et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment and order of the Superior Court of San Diego County, Robert P. Dahlquist, Judge. Reversed and remanded with directions.

Carothers DiSante & Freudenberger, Dave Carothers, Karimah J. Lamar and Jing Y. Li for Defendants and Appellants.

Law Offices of Ramona R. Hallam, Ramona R. Hallam; Law Office of Deborah E. Brady-Davis and Deborah E. Brady-Davis for Plaintiff and Respondent.

I.

INTRODUCTION

After a series of thefts from residents at a residential community for the elderly called Cypress Court, police advised Cypress Court's management to install video cameras and place bait money in some of the residents' apartments, in an attempt to catch

the thief. After doing so, on July 18, 2012, Cypress Court's resident relations director, defendant Tamara Gutierrez, determined that bait money that had been planted in a box in an elderly person's apartment had been removed. That same day, Gutierrez and Cypress Court's executive director, appellant Ricky Lansford, reviewed surveillance video that potentially implicated respondent Maria Delaluz Santos, who worked at Cypress Court as a resident assistant. Lansford and Gutierrez decided to call police.

Within a couple of hours, police arrived at Cypress Court and reviewed the video. After viewing the video, the police interviewed and searched Santos. Santos denied committing the theft and was not found to be in possession of the bait money. While the police were at Cypress Court, Lansford signed a form provided to him by a police officer, which effectuated a citizen's arrest of Santos. The officer gave Santos a notice to appear on the charge of petty theft and escorted her from the facility. The district attorney subsequently filed a criminal complaint against Santos, but, in December 2012, the charges were dismissed.

Santos filed this action in July 2013 against Gutierrez, Lansford, and two entities that either partially owned or managed Cypress Court, appellants Kisco Senior Living, LLC and KRC ESC Corp. (collectively "Kisco"), alleging numerous causes of action, including assault and battery, defamation, malicious prosecution, negligence, false arrest and intentional infliction of emotional distress. After the close of evidence, defendants moved for nonsuit and a directed verdict with respect to all of Santos's claims. The trial court granted the motion for nonsuit with respect to all of the claims asserted against Gutierrez, and all of the claims against the remaining defendants with the exception of

2

the false arrest and intentional infliction of emotional distress claims.  The jury returned a verdict against Kisco and Lansford (collectively "appellants") on the false arrest claim and in favor of appellants on the intentional infliction of emotional distress claim.[1]  The jury awarded Santos $65,965 in damages, and the trial court entered a judgment in accordance with the jury's verdict.

Appellants filed a motion for judgment notwithstanding the verdict (JNOV) in which they claimed that they were absolutely immune from Santos's false arrest claim pursuant to an immunity provision (Welf. & Inst. Code, § 15634)[2] in the Elder Abuse and Dependent Adult Civil Protection Act (the Act) (§ 15600 et seq.).  Appellants argued that the undisputed evidence established that Lansford was a mandated reporter under the Act, that Santos's claim was based on Lansford's "action of furthering the investigation [into elder abuse] by signing the citizen's arrest form," and that section 15634 prevents mandated reporters from being held liable for acts that "stem[ ] from [the] duty to report suspected financial abuse of an elder."  The trial court denied the motion, stating that the court was "not persuaded . . . that the mandated reporter immunity . . . bar[s] the false arrest claim . . . ."

---

[1]     The record indicates that the sole theory of liability upon which the jury rendered its verdict against Kisco was that Kisco was vicariously liable for Lansford's conduct. The trial court instructed the jury, "If you find that Ricky Lansford's false arrest and/or intentional infliction of emotional distress on [Santos] [*sic*], then you must decide whether [Kisco] are responsible for her harm."

[2]     Unless otherwise specified, all subsequent statutory references are to the Welfare and Institutions Code.

On appeal, among other contentions, appellants claim that the undisputed facts establish that they are absolutely immune from Santos's false arrest claim and that the trial court erred in denying their motion for JNOV on this ground.[3] We agree. The sole published appellate case applying section 15634 concludes that the immunity provided in the statute is "sweeping in its breadth." (*Easton v. Sutter Coast Hospital* (2000) 80 Cal.App.4th 485, 491 (*Easton*).) Further, in reviewing cases construing a nearly identical immunity provision for mandated reporters in the context of child abuse (Pen. Code, § 11172), this court has stated, "Without exception, our appellate courts have concluded that immunity is a key ingredient in maintaining the Act's integrity and thus have rejected efforts aimed at narrowing its protection." (*Stecks v. Young* (1995) 38 Cal.App.4th 365, 375.) For example, courts have concluded that mandated reporters may not be sued either for "conduct committed in furtherance of diagnosing whether abuse occurred," (*Arce v. Childrens Hospital Los Angeles* (2012) 211 Cal.App.4th 1455, 1492 (*Arce*)), or for "communications between the reporter and the public authorities responsible for investigating or prosecuting . . . abuse." (*Robbins v. Hamburger Home for Girls* (1995) 32 Cal.App.4th 671, 679 (*Robbins*).)

We conclude that section 15634 similarly protects mandated reporters from liability for conduct that is integrally related to a report of suspected elder abuse, and further conclude that the undisputed evidence establishes that Lansford's acts in this case

---

3       While this appeal was pending, we granted the California Assisted Living Association's (CALA) application to file an amicus brief in support of appellants. We also provided all parties with the opportunity to file an answer to CALA's brief. None of the parties timely filed an answer. We denied Santos's request to file an untimely answer.

constituted such conduct.  Accordingly, we reverse the judgment and the trial court's order denying appellants' motion for JNOV and remand the matter to the trial court with directions to grant appellants' motion and enter judgment in favor of appellants.[4]

## II.

## FACTUAL BACKGROUND[5]

A.  *Thefts at Cypress Court*

Beginning in March 2012, there was a large increase in the number of thefts at Cypress Court.[6]  Between March and July of that year, residents or their family members reported nine instances of theft to Gutierrez.

On June 25, 2012, a resident, Mr. N., together with a family member, reported a series of thefts to Gutierrez that they believed had been occurring over a period of approximately a month.  They told Gutierrez that $250 was missing from a lockbox in Mr. N.'s room and $45 was missing from his wallet.  Cufflinks and a wedding ring were also missing.  The police investigated the thefts.

---

[4]     In light of our disposition, we need not consider appellants' other arguments in support of reversal of the judgment and/or the court's order denying appellants' motion for JNOV.  Specifically, we need not consider appellants' arguments that they may not be liable for the tort of false arrest because a police officer requested that Lansford sign the citizen's arrest form, it would have been a misdemeanor for Lansford to refuse to assist the police, and there is insufficient evidence that Lansford had the requisite intent to commit the tort.  In addition, we need not consider appellants' claim that the trial court erred in instructing the jury on the tort of false arrest.

[5]     In light of the procedural posture of the case, we state the facts in the light most favorable to the verdict.  (See pt. III.A., *post*.)

[6]     Santos was hired by Cypress Court on March 13, 2012.

While investigating one of the thefts, police advised Gutierrez to speak with Detective Thompson of the Escondido Police Department concerning possible actions that Cypress Court could take concerning the thefts. Gutierrez and Lansford met with Detective Thompson. According to Gutierrez, Detective Thompson recommended that Cypress Court purchase video cameras and "set up some bait money," in an attempt to catch the thief. Gutierrez installed video cameras in some of the resident's apartments, including in Mr. N.'s.

B. *Gutierrez and Lansford suspect that Santos is responsible for the thefts*

On July 17, 2012, Gutierrez placed bait money inside an unlocked box in Mr. N.'s apartment. The following morning, Gutierrez went to Mr. N.'s apartment. Gutierrez looked inside the box and discovered that $40 was missing. Gutierrez then reviewed a video recording that "showed [Santos] near the [box] and touching the [box]."

Gutierrez explained that the video camera from which the recording was taken was motion activated, that she had watched all of the recordings between the time the bait money was placed in the box and the time the money was discovered missing, and that Santos was the only person near the box during this time. Gutierrez acknowledged, however, that the camera did not detect all motions in the room. Although she was not certain that Santos had taken anything out of the box, Gutierrez considered Santos's behavior on the video to be "suspicious," and felt that it "was necessary to report this to the police because [Gutierrez is] a mandated reporter."

Gutierrez asked Lansford to review the video clip of Santos that Gutierrez considered suspicious. Gutierrez and Lansford reviewed the video recording together.

6

After doing so, Gutierrez and Lansford agreed that they should call the police. Gutierrez placed the call.

C. *The police investigation*

At some point later that same day, Christi Torres, an employee in the human resources department at Cypress Court, went to a room in which Santos was working, directed Santos to come with her, walked Santos down to the lobby, and told Santos to wait in a chair in the lobby. Torres then went into Lansford's office, which was next to the lobby. Santos waited in the lobby as directed by Torres. After approximately two hours, Santos saw police officers arrive at Cypress Court.

Santos's supervisor brought her into Lansford's office. The supervisor, Lansford, Torres, and some police officers were in the room. The officers asked Santos whether she had been in Mr. N's room. Santos acknowledged that she had been in Mr. N.'s room in order to get him out of bed, clean his room, and send him to breakfast. The officers asked Santos whether she had taken anything from Mr. N.'s room. Santos denied having taken anything. The officers then instructed Santos to empty her pockets, which she did. Santos took a cookie wrapper, a phone, some gloves, a pager and a radio out of her pockets. After the search, everyone left Lansford's office, except for Santos and one police officer. Santos asked the officer what she was being accused of. The officer responded, "They have nothing on you."

A male police officer told Santos that they were going to have a female officer search her. Santos responded that she had $30 in her sock.[7] The serial numbers on the bills taken from Santos's sock did not match the serial numbers of the bait money. A female officer arrived and searched Santos. During the search, the officer touched Santos's breast area and waist area in a manner that Santos found offensive. None of the bait money was recovered during either of the searches, nor at any other time.

D. *Santos is arrested and charged with a crime, but charges are later dismissed*

At some point while the police were at Cypress Court,[8] Lansford signed a form that effectuated a citizen's arrest of Santos.[9] The citizen's arrest form is part of a July 18 arrest report that appears to be entitled, "San Diego Regional County Arrest/Juvenile Contact Report."[10] The first page of the two pages of the report that are in the record is

---

[7] Santos explained that she occasionally kept money in her sock while at work after having previously lost money at work while carrying it in her pocket.

[8] It is not clear from the record when exactly this arrest occurred in relation to the remainder of the interrogation and search. Santos asserts that the arrest occurred *after* the interrogation and search, but does not cite to any portion of the reporter's transcript that demonstrates the timing of the arrest in relation to the interrogation and search. However, the precise timing of the arrest is not material to our resolution of the appeal.

[9] The citizen's arrest form is contained in the appellant's appendix as an attachment in Santos's opposition to appellants' motion for JNOV. In addition, a two-page document, labeled court's exhibit 114, containing two pages of a July 18, 2012 arrest report, including the citizen's arrest form, is attached to CALA's amicus brief. Although it is not clear from the record whether court's exhibit 114 was offered in evidence at trial, it does appear that the same two pages of the July 18, 2012 arrest report were admitted in evidence as court's exhibit 1. Neither party contends that the two pages of the July 18, 2012 arrest report containing the citizen's arrest form is not properly in the record. Accordingly, we conclude that the two pages of the July 18, 2012 arrest report attached to CALA's amicus brief are properly before this court since they are identical to court's exhibit 1.

[10] A portion of the title of the document in the record is obscured.

8

written by Officer Lewis Shaver. The report states that the arrest occurred at 1:45 p.m. on July 18, 2012, lists Santos as the "arrestee," states the charge "PC 488 petty theft," and states that the victim of the offense is "Cypress Court Retirement."

The second of the two pages of the report contains a box labeled "Citizen Arrest." The box states, "I have arrested _____." Santos's name is handwritten on the line. Immediately below the line is the following:

"□ For a public offense committed or attempted in my presence.

"□ When the person arrested has committed a felony, although not in my presence.

"□ When a felony has been in fact committed, and I have reasonable cause for believing the person arrested to have committed it."

None of the boxes next to the three options listed in the text above is checked. Lansford signed this portion of the form. The second of the two pages of the report was also written by Officer Shaver, with the exception of Lansford's signature. Lansford signed that portion of the form, thereby effectuating a citizen's arrest of Santos.

Officer Shaver issued Santos a misdemeanor citation for petty theft. The citation stated that the violation occurred at 1:45 p.m. on July 18 and directed Santos to appear in court on or before September 4, 2012.

The district attorney subsequently filed a misdemeanor criminal complaint against Santos charging her with petty theft. The charges were dismissed in December 2012.

Santos suffered depression and anxiety as a result of the incident. In addition, she suffered a loss of income, incurred debt for the payment of attorney fees, and was unable to find similar employment.

9

III.

DISCUSSION

*The trial court erred in denying appellants' motion for JNOV on the ground that appellants were not immune from Santos's false arrest claim*

Appellants claim that the trial court erred in denying their motion for JNOV. In support of this claim, appellants argue that the undisputed facts presented at trial establish that they are immune from liability for Santos's false arrest claim.

A. *General principles of law governing a motion for JNOV and the applicable standard of review*

A trial court must grant a motion for JNOV whenever a motion for a directed verdict for the aggrieved party should have been granted. (Code Civ. Proc., § 629.) " ' "[T]he power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit." [Citation.] "A motion for a directed verdict 'is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom.' " ' " (*Baker v. American Horticulture Supply, Inc.* (2010) 186 Cal.App.4th 1059, 1072.)

Ordinarily, when reviewing a ruling on a motion for JNOV, "an appellate court will use the same standard the trial court uses in ruling on the motion, by determining whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict. ' " 'If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the

10

motion should be denied.' " ' " (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

Whether, in light of the facts viewed in the light most favorable to Santos, appellants are immune from Santos's false arrest claim presents a question of law that we review de novo. (See *King v. State of California* (2015) 242 Cal.App.4th 265, 289 [" 'The availability of . . . immunity after a trial is a legal question informed by the jury's findings of fact, but ultimately committed to the court's judgment' "]; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [stating that where an appeal from the denial of a motion for JNOV raises a legal issue, an appellate court reviews the question de novo].)

B. *Relevant law*

1. *The Act*

The Act "represents the Legislature's response to the problem of unreported elder abuse which came to its attention in the early 1980's." (*Easton*, *supra*, 80 Cal.App.4th at p. 490.) "The focus of the Act has always been to encourage reporting of abuse or neglect." (*Id.* at p. 491.)

Under the Act, "[a]ny person who has assumed full or intermittent responsibility for the care or custody of an elder or dependent adult . . . is a mandated reporter." (§ 15630, subd. (a).) Mandated reporters are statutorily required to report suspected instances of abuse, including financial abuse, of the elderly: "Any mandated reporter who, in his or her professional capacity, or within the scope of his or her employment, has observed or has knowledge of an incident that reasonably appears to be . . . financial

11

abuse . . . or reasonably suspects that abuse, shall report the known or suspected instance of abuse . . . as soon as practicably possible." (*Id.*, subd. (b)(1).) Pursuant to section 15610.30, " 'Financial abuse' of an elder . . . occurs when a person or entity does any of the following: [¶] . . . Takes . . . personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both." A report of suspected financial abuse of an elder may be made to "[a] local law enforcement agency," among other entities. (See § 15630, subd. (b)(1)(A).) Section 15658, subdivision (b)(7) specifies that "[t]he name of the individuals believed to be responsible for the incident and their connection to the victim," is among the information to be provided on the statutorily authorized "written abuse report" (*id.*, subd. (a)) required by the Act.

The Act contemplates that the appropriate authorities will undertake an investigation into such reports in order to protect the elderly person. For example, the Act provides that, "it is the intent of the Legislature in enacting this chapter to provide that . . . local law enforcement agencies shall receive referrals . . . from any mandated reporter submitting reports . . . and *shall take any actions considered necessary to protect the elder or dependent adult and correct the situation and ensure the individual's safety*." (§ 15600, subd. (i), italics added; see *People v. Davis* (2005) 126 Cal.App.4th 1416, 1435 (*Davis*) ["The enactment of such a comprehensive statutory scheme, which not only requires designated professionals to report known or suspected abuse but also sets up a system of outside agencies mandated to investigate reports of such abuse, amply demonstrates the scope and severity of the problem of elder and dependent adult abuse as perceived by the Legislature"]; *Easton*, *supra*, 80 Cal.App.4th at p. 493 ["The focus of

12

the statutory scheme is to encourage prompt reports *so as to protect the victim of the suspected abuse*" (italics added)].)

Section 15630 provides criminal sanctions for those mandated reporters who either fail to report abuse, including financial abuse, or who "imped[e] or inhibit[ ] a report" of such abuse. (*Id.*, subd. (h) ["Failure to report, or impeding or inhibiting a report of . . . financial abuse, or neglect of an elder or dependent adult, in violation of this section, is a misdemeanor"].) In addition, in order to further the statute's purpose of fostering "the broadest possible reporting of incidents of known and suspected abuse of elder and dependent adults," section 15630 has been construed to impose "criminal liability for failure to report, without regard to intent or negligence." (*Davis*, *supra*, 126 Cal.App.4th at p. 1437.)

In order to further ensure that mandated reporters comply with their reporting obligations, section 15634, subdivision (a) "create[s] an absolute privilege in those individuals required to make such reports . . . ." (*Easton*, *supra*, 80 Cal.App.4th at pp. 489, 494 ["Immunity from reporting suspected abuse is crucial to ensure compliance with the reporting obligation"].) Section 15634's immunity provision provides in relevant part:

> "No care custodian . . . who reports a known or suspected instance of abuse of an elder or dependent adult shall be civilly or criminally liable for any report required or authorized by this article." (*Id.*, subd. (a).)

In *Easton*, the court was "called upon to construe the breadth of the immunity from civil liability conferred by . . . section 15634." (*Easton*, *supra*, 80 Cal.App.4th at

13

p. 488.) In that case, a physician made a report to sheriff's deputies based on information that the physician had received from a nurse who had unsuccessfully attempted to persuade the plaintiff to take his mother to the hospital. (*Id.* at p. 489.) Authorities acted on the report by removing the plaintiff's mother from his home and taking her to the hospital. (*Ibid.*) The *Easton* court considered whether the physician and the nurse were immune from liability for trespass, false imprisonment and emotional distress claims premised upon the report and the seizure of the elderly woman. (*Id.* at pp. 489-490.) At the time of the incident, former section 15630, subdivision (b) provided that a mandated reporter who "has *observed* an incident that reasonably appears to be physical abuse," was required to report such abuse. (*Easton*, *supra*, at p. 491, italics added, quoting former § 15630, subd. (b).)

The *Easton* court first concluded that the immunity provided in section 15634 to mandated reporters was absolute, rather than qualified. The *Easton* court reasoned:

> "Based upon the purpose of the immunity provision and upon the Legislature's drafting of section 15634, we conclude that the privilege created by the section is absolute rather than qualified. The language of section 15634 distinguishes between mandated reporters of abuse who make required or authorized reports and nonmandated reporters. As to those who must report, the rule is sweeping in its breadth—no health practitioner who reports shall be civilly liable for any report. However, the section goes on to create only a qualified privilege for '[a]ny other person reporting.' Such nonmandated reporters 'shall not incur civil or criminal liability as a result of any report authorized by this article, unless it can be proven that a false report was made and the person knew that the report was false.' (§ 15634, subd. (a).) The plain meaning of the statutory language is that for mandated reporters the truth or falsity of the report is of no moment—the privilege is absolute." (*Easton*, *supra*, 80 Cal.App.4th at pp. 491-492.)

14

The *Easton* court then considered whether the physician and the nurse were entitled to immunity, notwithstanding that they had failed to "comply with the reporting method described in [former] section 15630" (*Easton*, *supra*, 80 Cal.App.4th at p. 492), in that the nurse had not *personally* called law enforcement, but instead had relayed information concerning the abuse to the physician, who called law enforcement. The *Easton* court "reject[ed] a strict reading of the reporting condition—namely that reports be made by one who 'has observed' a reportable incident—as inconsistent with either the letter or the spirit of the statutory scheme." (*Id.* at p. 493.) The *Easton* court reasoned that while a physician's reliance on a nurse's report of suspected abuse "was not expressly envisioned by the statutory scheme in effect as of [the time of the incident] the Legislature had in fact already taken action to amend the statute so that such reliance would be expressly permitted." (*Id.* at p. 494 [referring to an amendment to the statute requiring a mandated reporter who " 'has observed *or has knowledge of* an incident,' " to report such incident, quoting § 15630, subd. (b)(1), as amended by Stats. 1998, ch. 980, § 1].) The *Easton* court continued, "Clearly the purpose of the statutory scheme of which section 15630 is a part and the precise language of the 1998 version of the section, would not be advanced by denying immunity to either [the nurse] or [the physician]." (*Easton*, *supra*, at p. 494.)

2. *Mandated reporter immunity in the child abuse context*

In interpreting and applying section 15634, we may consider its "predecessor statutes, which created reporting requirements and immunity for mandated reporters of child abuse." (*Easton*, *supra*, 80 Cal.App.4th at p. 492.) Such case law is highly relevant

15

in light of the similarity of the two immunity provisions. (Compare § 15634 ["No care custodian . . . who reports a known or suspected instance of abuse of an elder or dependent adult shall be civilly or criminally liable for any report required or authorized by this article"] with Pen. Code, § 11172 ["No mandated reporter shall be civilly or criminally liable for any report required or authorized by this article"].)

Courts have repeatedly recognized the breadth of the immunity provision contained in Penal Code section 11172. (See, e.g., *B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 193 ["The Legislature . . . grant[ed] . . . broad immunities for those mandated reporters who report suspected instances of child abuse"]; *Thomas v. Chadwick* (1990) 224 Cal.App.3d 813, 821 (*Thomas*) ["To encourage reporting, the Legislature granted reporters broad immunities to obviate the chilling effect the spectre of civil lawsuits would have upon a reporter's willingness to become involved"].) "In order to promote the purpose of the act to protect abused children, [Penal Code] section 11172 provides that mandated reporters of child abuse are absolutely immune from liability." (*Robbins*, *supra*, 32 Cal.App.4th at p. 679; see also *Arce*, *supra*, 211 Cal.App.4th at p. 1485 ["The immunity extends even to negligent, knowingly false, or malicious reports of abuse"].)

Further, courts have broadly *interpreted* the immunity provided in Penal Code section 11172 beyond its literal text in order to effectuate this purpose. For example, in *Storch v. Silverman* (1986) 186 Cal.App.3d 671, 677 (*Storch*), despite the fact that the version of the statute applicable in the case was limited to persons "*who report*[ ] a known or suspected instance of child abuse" (*id.* at p. 675, fn. 3, italics added, quoting

16

former Pen. Code, § 11172, subd. (a)), the court concluded that the statute covered "those mandated reporters *who are involved in the identification* of an instance of child abuse but do not personally report it to the authorities." (*Storch*, *supra*, at p. 681, italics added.) In reaching this conclusion, the court reasoned:

> "Team immunity is consistent with the purpose and intent of the Legislature in promoting the reporting of child abuse. Limitation of immunity to the person making the telephone call to the agency or signing the report would defeat that purpose." (*Ibid.*)

In addition, and of particular relevance to this case, courts have broadly interpreted the child abuse mandated reporter immunity provision to apply to certain *conduct* related to a reporting event. For example, in *Krikorian v. Barry* (1987) 196 Cal.App.3d 1211 (*Krikorian*), the court considered whether "mandatory reporters [are] completely immune from liability for professional services rendered in connection with the identification or diagnosis of suspected cases of child abuse, or just for the act of reporting." (*Id.* at p. 1222.) The *Krikorian* court rejected the argument that mandated reporter immunity extended only to the "act of reporting" (*ibid.*), reasoning in part:

> "[L]imiting immunity to the protection of professionals against lawsuits resulting from the *act of reporting* would defeat the Legislature's goal of promoting increased reporting of child abuse. The Legislature has identified the fear of civil liability for allegedly false reports as a major deterrent to the reporting of suspected cases of child abuse by professionals. Recent revisions to the Child Abuse Reporting Act have been largely directed at reducing or eliminating, to the extent possible, professional[s'] fear of litigation resulting from required reports. A law conferring 'absolute' immunity for the act of reporting suspected child abuse, but *not* for professional activities contributing to its identification, would not likely allay the fear of a prospective reporter that an angry parent might initiate litigation for damages, following a report which is subsequently proven to be mistaken." (*Id.* at pp. 1222-1223.)

17

Ultimately, the *Krikorian* court held, "Insofar as liability for damages to a person falsely accused of child abuse is concerned, we conclude that [Penal Code] section 11172 was intended to provide absolute immunity to professionals for conduct giving rise to the obligation to report, such as the collection of data, or the observation, examination, or treatment of the suspected victim or perpetrator of child abuse, performed in a professional capacity or within the scope of employment, as well as for the act of reporting." (*Id.* at p. 1223.)

In *Arce*, *supra*, 211 Cal.App.4th 1455, the Court of Appeal applied *Krikorian*, among other cases, in concluding that a hospital's social worker (Wilson) and the hospital for which she worked were immune from claims for intentional infliction of emotional distress, invasion of privacy, and stalking premised on allegedly harassing phone calls that Wilson made to the parents concerning a bruise on their child's ankle. (*Id.* at pp. 1491-1492.) According to plaintiffs, when the father questioned Wilson about inconsistent statements that Wilson had made to the parents concerning her involvement in the case, Wilson " 'began to laugh at and antagonize the [p]laintiffs, and made the threat that [the parents'] children would again be taken away.' " (*Id.* at p. 1492.) The plaintiffs claimed that the trial court had erred in concluding that the defendants were immune from claims premised on such conduct, arguing, "Wilson's conduct did not involve the act of reporting child abuse within the meaning of Penal Code section 11172 and therefore was not protected under the statute." (*Ibid.*) The *Arce* court rejected this argument, noting, "Cases analyzing Penal Code section 11172 have concluded that the

18

statute provides immunity to claims predicated on false and malicious reports of abuse as well as conduct committed in furtherance of diagnosing whether abuse occurred." (*Ibid.*) Thus, even though the plaintiffs argued that Wilson's conduct was "harassing, antagonizing, and threatening" (*id.* at p. 1496), the *Arce* court concluded that the trial court had properly determined that "[t]he conduct alleged against Wilson falls within [Penal Code] section 11172." (*Ibid.*, italics omitted.)

Courts have also concluded that immunity under Penal Code section 11172 may "cloak[ ] the mandated reporter with immunity for activity [occurring] *after* the report of suspected child abuse . . . is made." (*Ferraro v. Chadwick* (1990) 221 Cal.App.3d 86, 92 (*Ferraro*).) In *Ferraro*, the court noted that Penal Code section 11172 extends immunity "not only to 'required' or mandated reporting but to another distinct category of reporting[,] that which is 'authorized' by the Act. (*Ferraro*, *supra*, at p. 93, quoting Pen. Code, § 11172, subd. (a); see also § 15634 [providing immunity "for any report required or *authorized* by this article" (italics added)].) The *Ferraro* court concluded that "communications by a mandated reporter to . . . law enforcement agencies that are statutorily entitled to receive and investigate reports of child abuse are '*authorized*' communications or reports under the [Child Abuse and Neglect Reporting Act], and, therefore, [a]re protected by the immunity of [Penal Code] section 11172, subdivision (a)." (*Ferraro*, at p. 95, italics added; see *Thomas*, *supra*, 224 Cal.App.3d at p. 822 ["It would be anomalous to conclude that the reporter's 'required' report of suspected child abuse is privileged, but that the legislatively contemplated subsequent communications

19

concerning the incident would expose the reporter to potential civil liability"].) The

*Ferraro* court reasoned in part:

> "Certainly, it is reasonable to infer the Legislature (1) anticipated that in the course of an investigation into suspected child abuse, the reporter . . . is going to be contacted and interviewed by the agency conducting the investigation and (2) sanctioned such communication between the reporter and the investigating agency. It is also reasonable to infer the Legislature foresaw the possibility of the reporter being contacted by the district attorney with respect to criminal investigations." (*Ferraro*, at pp. 94-95.)

C. *Appellants are immune from Santos's false arrest claim because the claim was premised on a mandated reporter's conduct that was integrally related to a report of suspected elder abuse*

It is undisputed both that Lansford was a mandated reporter under the Act and that Gutierrez's July 18 call to the police constituted a report required under the Act.[11] Thus, it is clear that appellants are immune from liability for any claims based on Gutierrez's call to the police. (See § 15634, subd. (a) [providing immunity for "any report required or authorized by this article"].) Santos does not dispute this.

The more difficult question is whether Lansford's acts on July 18 taken in connection with the police investigation that day, in response to Gutierrez's call, are similarly protected. In light of the case law discussed above and the particular circumstances of this case, we conclude that Lansford is immune from Santos's claim because his conduct was integrally related to a report of suspected elder abuse and thus constituted "authorized" activity within the meaning of section 15634.

___

[11]    Lansford and Santos both testified that Lansford was a mandated reporter of elder abuse, and there was no contrary testimony. In her brief, Santos concedes that Gutierrez's initial report to the police was "appropriate."

20

At the outset, we must specifically identify the conduct on which Santos's false arrest claim is based. Santos suggests that her false arrest claim is premised on the search, interrogation and arrest that occurred on July 18, as well as the ensuing prosecution. Her brief states the following:

> "Ms. Santos concedes that reporting is appropriate. It was the further act of arresting Ms. Santos after performing an illegal strip-search and questioning, and subjecting her to prosecution even upon discovery that she had no[t] stolen property that is problematic."[12]

To the extent that Santos contends that the jury's verdict on her false arrest claim is supported by evidence of Lansford's purported conduct in searching, interrogating, or prosecuting Santos, we disagree. There is no evidence that Lansford participated in either the search or questioning conducted by the police on July 18. Santos testified that police officers interrogated and searched her.[13] Detective Shaver testified that he questioned Santos and informed her that a female officer would be arriving at the scene to search her. Lansford testified that he was not in the room during the interrogation and

---

[12]    Santos also referred to the interrogation, search, and arrest in the false arrest claim in her complaint.

[13]    At one point in her testimony, Santos stated that Lansford and the police officers were in a room and that "they" asked her questions concerning whether she had been in Mr. N.'s room. Shortly thereafter, Santos stated, "They said for me to bring out anything that I had in my pockets." Defense counsel then asked, "Okay. Now, who is they?" Santos responded, "The police officers." Santos did not specifically state that Lansford had participated in the interrogation.

search.  Further, there also is no evidence that Lansford participated in the prosecution of Santos's criminal case.[14]

Thus, we are left to consider whether Lansford's act in signing a form that effectuated a citizen's arrest of Santos constitutes conduct protected by the immunity afforded by section 15634.  In considering this issue, we begin by rejecting Santos's assertion that "[m]andated reporter immunity only extends to reporting and *does not extend to conduct*." (Capitalization & boldface omitted, italics added.)  As noted above, courts have concluded that mandated reporters in the child abuse context may not be held liable for "*conduct* committed in furtherance of diagnosing whether abuse occurred." (*Arce*, *supra*, 211 Cal.App.4th at p. 1492, italics added).  We see no reason why this same principle should not apply when interpreting the nearly identical immunity provision in the Act.[15]  For the same reason, we conclude that case law in the child abuse context providing that mandated reporters are immune for communications with law enforcement that occur *after* an initial report of abuse that are related to abuse (see *Ferraro*, *supra*, 221 Cal.App.3d at pp. 92, 95), should apply with equal force in interpreting section 15634.

---

14    The deputy district attorney who was assigned to prosecute Santos's criminal case testified at trial.  Neither his testimony, nor any other evidence in the record demonstrates that Lansford had any role in the prosecution of Santos's criminal case.

15    We are not persuaded by Santos's argument that no mandated reporter immunity may lie because "[s]igning a citizen's arrest form is an act."  In support of this contention, Santos cites *Kesmodel v. Rand* (2004) 119 Cal.App.4th 1128, 1136 (*Kesmodel*), which she contends is "directly on point."  *Kesmodel* did not concern the scope of mandated reporter immunity, but rather, addressed whether a citizen's arrest constituted communication protected by the litigation privilege in Civil Code section 47, subdivision (b). (*Kesmodel*, *supra*, at pp. 1134-1140.)  The case is inapposite because unlike mandated reporter immunity, the litigation privilege "protects only communications or broadcasts." (*Id.* at p. 1137.)

22

This case falls within the intersection of these two lines of cases. Further, the undisputed evidence discussed below establishes that Lansford's act in signing a citizen's arrest form constituted activity that was so integrally related to a report of elder abuse that it constituted conduct that falls within the "sweeping . . . breadth" of the immunity afforded in section 15634. (*Easton*, *supra*, 80 Cal.App.4th at p. 491.)

To begin with, we consider the nature of Lansford's act as to which liability is sought. Lansford's conduct in this case—signing a form to effectuate a citizen's arrest— was far more similar to an act of "reporting" than other conduct to which courts have determined immunity extends. (See *Arce*, *supra*, 211 Cal.App.4th at pp. 1491-1492 [making harassing telephone calls]; *McMartin v. Children's Institute International* (1989) 212 Cal.App.3d 1393, 1401 [interviewing children]; *Krikorian*, *supra*, 196 Cal.App.3d at pp. 1213, 1222-1223 [providing psychotherapeutic services]; *Storch*, *supra*, 186 Cal.App.3d at p. 674 & fn. 2 [conducting medical examinations and a pathology analysis].) As amicus CALA argues, "[I]t is not apparent that signing a citizen's arrest form should be construed as something other than 'reporting' even in the literal sense of the word."

In addition, it is clear that Lansford's conduct was undertaken in connection with an official investigation into suspected elder abuse occasioned by Lansford and Gutierrez's mandated report of such suspected abuse. We are not persuaded by Santos's argument that Lansford's conduct was undertaken in order to protect *Cypress Court's* property (i.e., the bait money placed in Mr. N.'s room), and thus, the arrest was unconnected to a report of *elder* abuse. Clearly, Lansford's conduct would not have been

23

protected by section 15634 if Lansford had suspected Santos of stealing money from his office and effectuated a citizen's arrest of her. But, in this case, the undisputed evidence demonstrates that Gutierrez's initial call to the police was made because Gutierrez and Lansford suspected that Santos had been stealing property belonging to the elderly residents at Cypress Court, i.e., committing financial abuse of the elderly.[16] That evidence includes undisputed evidence of prior thefts of elderly residents' property, prior reports to the police concerning those thefts, police instruction to management to place video cameras and bait money at the facility in attempt to catch the thief, and Gutierrez's discovery of missing bait money and video potentially implicating Santos as the thief. In light of this evidence, we reject Santos's assertion that "[t]his is not a case where the arrest at issue was performed in furtherance of a report to law enforcement."

This case stands in sharp contrast to *James W. v. Superior Court* (1993) 17 Cal.App.4th 246 (*James W.*), in which this court concluded that mandated reporter immunity did not apply to the conduct of a family counselor and foster parent who, for two and one-half years after a report of sexual abuse, allegedly coerced a child into falsely naming her father as the perpetrator of the abuse. (*Id.* at pp. 258-259.)[17] The *James W.* court concluded that defendants, who had "[not] identified or reported child

_____

[16] As noted previously, Santos concedes that Gutierrez's initial report to the police was "appropriate." We agree that it is clear that Gutierrez called the police because she and Lansford suspected *elder* abuse. Gutierrez's conduct in calling the police would *not* have been entitled to immunity if she were merely calling to report a theft of Cypress Court's property.

[17] The complaint in *James W.* alleged that defendants participated in "a campaign that included concealing evidence and inducing confessions and accusations by fraud, coercion, and perjury." (*James W.*, *supra*, at p. 249.)

abuse,"[18] were not entitled to immunity because they "voluntarily assumed roles of those who, having received the report and determined the identity of the perpetrator, search for corroboration and/or attempt to pressure a witness to get a conviction." (*Id.* at p. 256.)

Unlike in *James W.*, Lansford's conduct occurred both while law enforcement officers were physically present at the scene conducting an investigation, and in close temporal proximity to the initial report of abuse.[19] Further, even viewing the facts in the light most favorable to Santos, as is required (see pt. III.A., *ante*), there is *no* evidence that Lansford "usurped the function" of the authorities (*Robbins*, *supra*, 32 Cal.App.4th at p. 680, discussing *James W.*) such that he would not be entitled to mandated reporter immunity under *James W.* (See also *Jones v. County of Los Angeles* (9th Cir. 2015) 802 F.3d 990, 1008 [applying *James W.* to conclude that doctor who "usurped DCFS's authority under California law to take a child into temporary custody," was not entitled to child abuse mandated reporter immunity].)

In light of the case law interpreting the broad mandated reporter immunity provided in the elder and child abuse context, the nature of Lansford's conduct, and its

---

18    The *James W.* court explained that "hospital staff" had reported the abuse and that the defendants "came onto the scene after the fact—after child abuse had been positively identified and reported." (*James W.*, *supra*, at p. 256.)

19    Lansford's conduct was far closer in time to the initial reporting event than has been true in other cases in which mandated reports have been determined to be immune. (See, e.g., *Ferraro*, *supra*, 221 Cal.App.3d at p. 92 [stating that immunity may apply "*after* the report of suspected . . . abuse . . . is made," and concluding that defendants were immune for statements made more than two years after initial reporting event]; *Thomas*, *supra*, 224 Cal.App.3d at pp. 816-817 [doctor and hospital immune from suit for letter sent to district attorney approximately one month after initial report of child abuse "urging the district attorney to take action to remove appellants' other child . . . from her parents' home"].)

close relationship to an official investigation into suspected elder abuse, we conclude that Lansford is immune from Santos's false arrest claim as a matter of law. Accordingly, we conclude that the trial court erred in denying appellants' motion for JNOV.[20]

IV.

DISPOSITION

The judgment and the trial court's order denying appellants' motion for JNOV are reversed. The matter is remanded to the trial court with directions to grant appellants' motion for JNOV and enter judgment in favor of appellants. In the interests of justice, each party to bear its own costs on appeal.

AARON, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

---

[20] In light of our conclusion that Lansford is immune from Santos's false arrest claim, we necessarily conclude that Kisco also may not be held vicariously liable for such claim.

26